Michael D. Black (9132) mblack@parrbrown.com
April M. Medley (16102) amedley@parrbrown.com
PARR BROWN GEE & LOVELESS
101 South 200 East, Suite 700
Salt Lake City, Utah  84111
Telephone:     (801) 532-7840
Facsimile:     (801) 532-7750

Attorneys for Plaintiffs

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MARY GRIGSBY, WADE TAYLOR, and LMW PROPERTIES, LLC<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>INCOME PROPERTY USA, LLC, BUYPD, LLC, YANCEY, LLC, EVTECH MEDIA, LLC, REAL ESTATE EDUCATION GROUP, IMPROVEMENT HOMES, LLC, INTERACTIVE HOMES, LLC, EXPANSION PROPERTIES, LLC, IVYVEST PROPERTIES, LLC, GUARDIAN LAW, and INSIDER'S CASH, LLC<br>　　　　Defendants. | **AMENDED COMPLAINT**<br>(JURY DEMANDED)<br><br><br>Case No. 2:17-cv-01110-EJF<br><br>Magistrate Judge Evelyn J. Furse |

Plaintiffs bring this action against Defendants and for their claims allege as follows:

### PRELIMINARY STATEMENT

1.      The Defendants in this case are participants in a real estate scheme.  It contains all
of the bells and whistles that such scams typically employ:  an introductory "hook," a celebrity

endorser who rarely ever appears, a multiplicity of increasingly expensive "add-on" seminars and services to steal more money and further entrench their victim, and a final "bait and switch" to sell properties directly to their victims at inflated prices with expensive additional services. These scams are not original, but they are certainly illegal.

2.    The quality of the "educational seminars" is not at issue in this case.  Whether they educate or not, the seminars have a hidden ulterior purpose—to identify and select from the participants potential victims for the Buying Summit—the "boiler room" event at which victims are convinced to avoid the "hard work" of actually putting the purported training into action and instead to purchase real estate from the scammers themselves at wildly inflated prices, who purport to have already done the "hard work" for their victims.  The properties, however, are inevitably sub-par and distressed, and the sale was procured solely through racketeering and fraud.

## PARTIES

### Plaintiffs

3.    Plaintiff MARY GRIGSBY ("Ms. Grigsby") is an individual who resides in Florence, Alabama, and is a citizen of Alabama.

4.    Plaintiff WADE TAYLOR ("Mr. Taylor") is an individual who resides in Killen, Alabama, and is a citizen of Alabama.

5.    Plaintiff LMW PROPERTIES, LLC ("LMW") is a Utah limited liability company.  LMW's managers and only members are Ms. Grigsby and Mr. Taylor of Alabama. LMW is a citizen of the State of Alabama.  Under the instructions of Defendants, Ms. Grigsby and Mr. Taylor paid Veil Corporate and Guardian Law (described within) to create LMW for the

purpose of purchasing the properties at issue.

### The Central Bad Actors

6.     Defendant BUYPD, LLC ("BuyPD") is a Utah limited liability company with a principal address of 360 South Technology Court, Suite 100, Lindon, UT 84042.  BuyPD has two members: Titan Training Group, LLC ("Titan"), a Utah limited liability company, and Ryan Poelman, an individual who resides in Utah.  Titan's sole member is Ryan Poelman.  BuyPD is a citizen of the State of Utah.

7.     Defendant INCOME PROPERTY USA, LLC ("Income Property USA") is a Utah limited liability company with a principal address of 280 South Main Street, Suite 103A, Pleasant Grove, Utah 84062.  Income Property USA's sole member is Core Capital Property, LLC ("Core Capital"), a Utah limited liability company.  Core Capital's sole member is BuyPD. Income Property USA is a citizen of the State of Utah.

8.     BuyPD and Income Property USA are the companies that ultimately own, benefit from, and coordinate the seminar and real estate scam.

### The Seminar Companies

9.     Defendant YANCEY, LLC ("Yancey") is a Utah limited liability company with a principal address of 125 East Main Street, Suite 614, American Fork, Utah 84003.  Yancey's Manager is Shawn Finnegan, an individual residing in Utah.  On information and belief, Yancey is a citizen of the State of Utah.

10.    Defendant EVTECH MEDIA, LLC ("EvTech Media") is a Utah Liability Company with a principal address of 380 Technology Court, Suite 100, Lindon, Utah 84042. EvTech Media has two members: KOLOPO, LLC ("KOLOPO"), a Utah limited liability

company, and SAVCO, LLC ("SAVCO"), a Utah limited liability company. KOLOPO's sole member is Shawn Finnegan, an individual who resides in Utah. SAVCO's sole member is also Shawn Finnegan of Utah. EvTech Media is a citizen of the State of Utah.

11.     Defendant RESPONSE NORTH, LLC d/b/a/ REAL ESTATE EDUCATION GROUP ("Education Group") is a Utah limited liability company with a principal address of 360 South Technology Court, Suite 210, Lindon, Utah 84042. Education Group's manager is Phil Smith, an individual residing in Utah. On information and belief, Education Group is a citizen of the State of Utah.

12.     These are the entities that organize, promote, and present the seminars involved in this scam.

<strong>The Real Estate Sellers</strong>

13.     Defendant IMPROVEMENT HOMES, LLC ("Improvement Homes") is an Illinois limited liability company with a principal address of 360 South Technology Court, Suite 100, Lindon, Utah 84042—the same address as BuyPD and Insider's Cash (described within). Improvement Homes has two managers: Robert Lewis and Steve Leichty, both individuals residing in Utah. On information and belief, Improvement Homes is a citizen of the State of Utah. In conjunction with Defendants, Improvement Homes fraudulently sold the Calumet City Property to LMW.

14.     Defendant INTERACTIVE HOMES, LLC ("Interactive Homes") is an Illinois limited liability company. Interactive Homes' sole manager is BuyPD. On information and belief, Interactive Homes is a citizen of the State of Utah. In conjunction with Defendants, Interactive Homes fraudulently sold the Sauk Village Property to LMW.

15.     Defendant EXPANSION PROPERTIES, LLC ("Expansion Properties") is a Utah limited liability company.  Expansion Properties' manager is Income Property USA.  On information and belief, Interactive Homes is a citizen of the State of Utah.  In conjunction with Defendants, Expansion Properties fraudulently sold the Ferndale Property to LMW.

16.     Defendant IVYVEST PROPERTIES, LLC ("IvyVest Properties") is a Delaware limited liability company with a principal address of 360 South Technology Court, Suite 100, Lindon, UT 84042.  On information and belief, IvyVest Properties has two managers: Robert Lewis and Steve Leichty, both individuals residing in Utah.  On information and belief, IvyVest Properties is a citizen of the State of Utah.  In conjunction with Defendants, IvyVest Properties fraudulently sold the North Port Lot to LMW.

17.     All of these entities are ultimately owned and/or controlled by Income Property USA and/or BuyPD, and are the entities that buy and sell the properties involved in this scam.

### The Add-on Companies

18.     Defendant GUARDIAN LAW, LLC ("Guardian Law") is a Utah limited liability company with a principal address of 770 East Main, Suite 242 Lehi, Utah 84043.  Guardian Law has two members: Gregory Christiansen, an individual residing in Utah, and GJ Christiansen P.C., a company incorporated in the State of Utah with a principal place of business in Utah.  Guardian Law is a citizen of the State of Utah.  Guardian Law purports to be a law firm, title agent, and real estate escrow agent for all properties purchased at the Buying Summit, and provided legal services to Ms. Grigsby and Mr. Taylor.

19.     Defendant INSIDER'S CASH, LLC ("Insider's Cash") is a Utah limited liability company.  BuyPD is the sole member and manager of Insider's Cash.  Insider's Cash is a citizen

of the State of Utah.  Insider's Cash, in conjunction with Defendants, guarantees and provides loans on all properties sold at a Buying Summit and then markets and sells the same loan to a different victim at a Buying Summit.

## JURISDICTION & VENUE

20.    This Court has diversity jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

21.    Pursuant to 28 U.S.C. § 1331, this Court also has federal question jurisdiction over this action as it includes claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.

22.    This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

23.    Venue is proper under 28 U.S.C. § 1965(a) as the District of Utah is the district where one or more the Defendants resides, and pursuant to the forum selection clauses in the contracts at issue.

## FACTUAL ALLEGATIONS

### The Free Introductory Real Estate Event

24.    Most real estate scams begin with a free introductory event to "hook" its victims. This scheme operated in exactly this manner.

25.    In or about December 2014, Yancey, EvTech Media, and Education Group (the "Seminar Defendants"), sent Ms. Grigsby a personal invitation via U.S. mail to attend a free real estate income event.

26.     The invitation featured Scott Yancey, star of the A&E reality television show *Flipping Vegas*, and indicated that the "event is Presented by Scott Yancey."

27.     Seminar Defendants promoted the free seminar as a chance to follow in Scott Yancey's footsteps, featuring pictures of properties purchased at "wholesale" prices by BuyPD and encouraging Ms. Grigsby to register fast for the chance to learn how to "[p]urchase [similar] real estate at all-time low prices before they are bid up by hundreds of investors," and to "get the best properties before the public has access to them."

28.     Seminar Defendants further promised to show Ms. Grigsby and her guest "how to get up to $750,000 in pre-approved real estate funding regardless of credit score," "how to find income properties [they] can flip overnight," and essentially how to use their retirement funds "to build wealth in real estate."

29.     At the time the Seminar Defendants drafted and sent the invitation, they knew that an unstated purpose of the free seminar was to identify potential victims for the real estate sales scheme.

30.     In or about December 2014, induced by the Seminar Defendants' representations in the invitation, Ms. Grigsby called and registered for the event on behalf of herself and Mr. Taylor.  Shortly thereafter, Ms. Grigsby received tickets from Seminar Defendants in the mail.

31.     On January 6, 2015, Ms. Grigsby and Mr. Taylor attended the free real estate income event entitled "Private Sales: Scott Yancey" at the Marriot Shoals Hotel in Florence, Alabama.

32.     Seminar Defendants presented real estate investment information during a portion of the half-day event.

7

33.     Seminar Defendants spent significant part of the event hard-selling Ms. Grigsby and Mr. Taylor to "take control of their futures" and purchase a nearly $2,000 3-Day Real Estate Workshop Package (the "3-Day Package") where invaluable investing education, tips, strategies, and information would  be revealed by Seminar Defendants.

34.     This type of "upsale" is typical of real estate seminar scams, and, apart from any educational content, was used to identify persons with sufficient resources who might be potential victims for the eventual real estate sales scheme.

35.     In addition to a 3-day workshop, purchasers of the 3-Day Package were promised "[a]ccess to funding through [Defendants'] strategic partners," "[t]ransactional funding at 1%," and "[t]welve months of customer support."

36.     Induced by Defendants' representations, Ms. Grigsby and Mr. Taylor agreed to purchase the 3-Day Package from Defendants for $1,997.

37.     At the same time, Seminar Defendants sought to upsell Ms. Grigsby and Mr. Taylor on another separate program by offering them the opportunity to put their soon-to-be real estate prowess into immediate action with "[m]embers only access to purchase real estate assets" via Defendants' Simple Real Estate Program ("Simple Program").

38.     When Ms. Grigsby and Mr. Taylor declined to purchase the Simple Program, Seminar Defendants offered them the Simple Program for a reduced price of $997.00, instead of $1,497. Seminar Defendants pressured Ms. Grigsby and Mr. Taylor to purchase the Simple Program "right then" or "not at all."  This duress was intentional to identify victims who might be susceptible to "boiler room" tactics and to prevent Ms. Grigsby and Mr. Taylor from having time to consider the purchase and the terms of the purchase.

39.     Induced by Seminar Defendants' representations, Ms. Grigsby and Mr. Taylor purchased the Simple Program from Seminar Defendants for $997.00 while attending the event.

40.     To complete the transaction, representatives of Yancey required Plaintiffs to immediately sign a purchase order authorizing payment.  The terms and conditions were set forth on the reverse side of the single-page document, including an arbitration clause.  The terms of the arbitration clause were drafted by Defendants to insulate the web of companies forming the illegal enterprise from discovery and from liability for the fraudulent scheme.  The terms were never explained to Plaintiffs.

41.     The Seminar Defendants presented the purchase order as a formality solely relating to the purchase of educational materials.

42.     Nothing in the boilerplate adhesion contract put Plaintiffs on reasonable notice that they were subjecting themselves to be the targets of Defendants' real estate sales scheme or waiving any rights related to Seminar Defendants' grooming and selecting them to be victims of the scheme.

### 3-Day "Success in Real Estate" Workshop

43.     On January 16, 17 and 18, 2015, Ms. Grigsby and Mr. Taylor attended the Yancey 3-Day "Success in Real Estate" Workshop ("Success Workshop") at the Marriott in Birmingham, Alabama.

44.     At the Success Workshop, Seminar Defendants distributed a folder and training manual to Ms. Grigsby and Mr. Taylor.  Seminar Defendants utilized and discussed these materials over the course of the Success Workshop.

45.     The materials in the folder, aside from any education purpose, were drafted by

9

Seminar Defendants to induce Ms. Grigsby and Mr. Taylor to place their trust in Defendants and to view their relationships with Defendants as a partnership.

46.     For example, the folder included a "Warranty of Service" whereby Yancey declared its "commit[ment] to providing [workshop attendees] everything [they] need to achieve [their] financial goals through [Defendants'] real estate education, organization, and affiliates" and instructed Plaintiffs to "remember, Yancey events takes a partnership approach with everyone we work with" and "[r]est assured knowing we are committed to your financial success!"

47.     Similar to the free seminar, the Success Workshop was sold by the Seminar Defendants with an undisclosed purpose to identify and groom persons with sufficient resources who might be potential victims for the eventual real estate sales scheme.

48.     On the first day of the Success Workshop, Seminar Defendants instructed Ms. Grigsby and Mr. Taylor to increase their credit card limits purportedly to establish "seed capital for [their] real estate business."  Seminar Defendants provided a script and encouraged Ms. Grigsby and Mr. Taylor to increase their limits to $50,000.

49.     At the same time, Seminar Defendants sought comprehensive personal financial information from Ms. Grigsby and Mr. Taylor.

50.     Having induced workshop participants to increase their credit lines and reveal private financial information, representatives of Seminar Defendants then sought to upsell Success Workshop participants, including Ms. Grigsby and Mr. Taylor, the Gold, Platinum, or Diamond advanced training packages, depending on each participant's revealed means.

51.     Seminar Defendants represented that each package guaranteed access to the Las

Vegas Buying Summit where Ms. Grigsby and Mr. Taylor would "be trained by some of the foremost experts in areas of real estate, tax liens, asset protection, and self-directed IRAs," have "the opportunity to buy homes from around the United States at huge discounts," and "[t]ransactions [would] be closed on site."

52.     Seminar Defendants knew that the undisclosed purpose of the Buying Summit was to create a high-pressure, "boiler room" environment to sell distressed properties to the specifically chosen victims at inflated prices.

53.     On January 18, 2015, relying on Seminar Defendants' representations that their "success depends on [their] willingness to be teachable and follow [their] mentor" and that they would have the opportunity to purchase deeply discounted, rent-ready real estate properties at the Buying Summit, Ms. Grigsby and Mr. Taylor purchased the Diamond Package from Seminar Defendants for $29,997.

54.     To complete the transaction, representatives of Yancey required Plaintiffs to immediately sign a purchase order authorizing payment.  The terms and conditions were set forth on the reverse side of the single-page document, including an arbitration clause.  The terms of the arbitration clause were drafted by Defendants to insulate the web of companies forming the illegal enterprise from discovery and from liability for the fraudulent scheme.  The terms were never explained to Plaintiffs.

55.     The Seminar Defendants presented the purchase order as a formality solely relating to the purchase of educational materials.

56.     Nothing in the boilerplate adhesion contract put Plaintiffs on reasonable notice that they were subjecting themselves to be the targets of Defendants' real estate sales scheme or

waiving any rights related to Seminar Defendants' grooming and selecting them to be victims of the scheme.

57.     At the Success Workshop, Seminar Defendants also instructed Ms. Grigsby and Mr. Taylor to purchase asset protection legal services from Veil Corporate in anticipation of purchasing rental properties.

58.     On January 19, 2015, relying on Seminar Defendants representations, Ms. Grigsby and Mr. Taylor purchased asset protection from Veil Corporate for $595 that was said to include "Single Entity Setup (Utah LLC)," "State Filing Fees," "1 Year Agent Fees," "EIN Federal Employer Identification Number," and "Articles of Organization/Operating Agreement."

59.     On January 21, 2015, Guardian Law identified itself as a law firm assisting Veil Corporate in providing Plaintiffs the asset protection legal services purchased from Veil Corporate.

60.     On February 3, 2015, Veil Corporate, LLC and Guardian Law set up LMW Properties, LLC for Ms. Grigsby and Mr. Taylor.

**The "Boots on the Ground" Training**

61.     In addition to the trip to Las Vegas and participation in the Buying Summit, the Diamond Package also provided Ms. Grigsby and Mr. Taylor access to three-day, local trainings called "Boots on the Ground" where Seminar Defendants promised to teach the latest real estate tips and techniques both inside the classroom and out in the field.

62.     On February 5, 6, and 7, 2015, Ms. Grigsby and Mr. Taylor attended the "Boots on the Ground Training" put on by Seminar Defendants at the Courtyard Birmingham Downtown UAB hotel in Birmingham, Alabama.

63.     The Boots on the Ground Training was focused on teaching participants techniques for real estate "wholesaleing" (i.e., contract assignment).

64.     Seminar Defendants represented to Ms. Grigsby and Mr. Taylor that the wholesale techniques they would teach involve the use of other people's money and that "No Money Down = 0 Risk."

65.     Throughout the Boots on the Ground Training, Seminar Defendants taught techniques for identifying buyers and investors for wholesaling (i.e., contract assignment), which included creating "bandit signs."

66.     Bandit signs are roadside signs seeking to solicit investors with sayings such as "Fixer Upper!!! Must Sell/Motivted [sic] SFR 3/2 Cash Only" or "Handyman Special Needs everything Investors Only!"

67.     Bandit signs are illegal in many municipalities in the United States.

68.     Separate from the wholesaling training, Seminar Defendants pitched the Buying Summit as the ready-made alternative to the onerous wholesaling techniques, representing the following:

   a.   The properties have been vetted by Defendants' Power Team;

   b.   Properties available are "[r]enovated, [r]ented & [m]anaged, [r]eady for [p]urchase;"

   c.   Insider's Cash will provide transactional lending at "[c]ompetitive [r]ates;" and

   d.   Veil Corporate will provide "entity setup" and "asset protection."

13

69.     Seminar Defendants urged Ms. Grigsby and Mr. Taylor to register for the Buying Summit "ASAP as the market conditions continue to improve and prices on properties are better than ever, but not assured to last at these depressed levels."

70.     Seminar Defendants knew at the time they sold the Boots on the Ground training that a hidden purpose would be to select and groom victims for the Buying Summit.

### The Advanced "Inner Circle and Protégé Program"

71.      On or before February 11, 2015—just three weeks after Ms. Grigsby and Mr. Taylor purchased the Diamond Package and asset protection services from Seminar Defendants for nearly $36,000—Seminar Defendants contacted Ms. Grigsby and Mr. Taylor by phone multiple times in attempt to hard-sell yet another advance training opportunity known as "Inner Circle and Protégé Program," which Seminar Defendants offered to Ms. Grigsby and Mr. Taylor for an additional $19,995.

72.     During the phone calls, Seminar Defendants represented to Ms. Grigsby and Mr. Taylor that a membership includes exclusive VIP access to the best investment properties available at the Buying Summit, and that they needed to purchase a membership in order to maximize their results at the Buying Summit.

73.     Seminar Defendants further represented that the Inner Circle/Protégé Program would include the following: "30 Interactive On-demand Lessons," "15 Strategy Sessions," "Advisory Line," "Phone Seminars," "Real Estate Toolbar," "Investor Pipeline," "FSBO Home Bargains," an "Onsite Mentor," and a warranty whereby Seminar Defendants promised to help Ms. Grigsby and Mr. Taylor close five deals.

74.     On or around February 11, 2015, in reliance on Seminar Defendants'

14

representations, including that they would have the opportunity to purchase the best of the deeply discounted, rent-ready real estate properties at the Buying Summit, Ms. Grigsby and Mr. Taylor purchased the "Inner Circle/Protégé Program" for $19,995 from the Seminar Defendants.

75.     Seminar Defendants knew at the time they marketed and sold Membership in the Inner Circle/Protégé Program that it was a platform for inducing victims to purchase real estate at the Buying Summit.

### The "Overview of Real Estate Asset Ownership"

76.     In or around March of 2015, Plaintiffs Mary Grigsby and Wade Taylor received a spiral bound pamphlet from BuyPD and Income Property USA (the "Buying Summit Defendants") entitled "An Overview of Real Estate Asset Ownership" (the "Overview Pamphlet").

77.     The Overview Pamphlet represented "Income Property USA is the online presence of BuyPD."

78.     The Overview Pamphlet made the following false and misleading representations about the conditions and tenancy of the properties available for purchase from the Buying Summit Defendants:

a.     "We find low cost and distressed properties in great neighborhoods.  We then perform any repairs or rehabbing needed."

b.     "By the time we sell them to our clients they are either tenanted or rent ready.  Our clients are then able to get great prices without the hassle of doing repairs themselves."

79.     At the time the Buying Summit Defendants drafted the Overview Pamphlet, they

15

knew that the properties for sale at the Buying Summit were not all located in great neighborhoods, that they did not perform all necessary repairs or rehabbing on the properties, that many of the properties were neither tenanted nor rent ready, and that the properties were being sold for well above fair market value.

### The Las Vegas "Diamond Tour" and "Buying Summit"

80.     Leading up to the Las Vegas Diamond Tour and Buying Summit, Buying Summit, LLC, a Utah limited liability company with the same principal address as Income Property USA, sent on behalf of Buying Summit Defendants a series of five "Get Ready" emails to Ms. Grigsby and Mr. Taylor.  In the emails, Defendants made the following representations:

  a.  "BuyPD and Income Property USA are the providers of all the performing assets that will be available to you."

  b.  BuyPD and Income Property USA will "ensure that [Ms. Grigsby and Mr. Taylor] have adequate time to review the inventory and comfortably sort through the available assets" at the Buying Summit.

81.     At the time the emails were drafted, Buying Summit Defendants knew that Ms. Grigsby and Mr. Taylor would not be given adequate time to review the properties available for purchase and instead would be pressured into purchasing multiple dilapidated properties, owned by multiple entities other than BuyPD and Income Property(including unrelated third parties), sight unseen based on phony inspections and market analyses.

82.     The emails further encouraged Mr. Taylor and Ms. Grigsby to complete the Investor Questionnaire and to move the funds in their conventional retirement accounts to self-directed retirement accounts in preparation for the Buying Summit.

83.     On March 11 through 15, 2015, Ms. Grigsby and Mr. Taylor flew to Las Vegas, Nevada to attend the "Diamond Tour Advanced Training" (the "Diamond Tour") and the "Buying Summit," a two-part event presented by Buying Summit Defendants.

84.     On March 11 and 12, 2015, Buying Summit Defendants took Ms. Grigsby and Mr. Taylor, and other Diamond Tour participants, on a bus tour around Las Vegas for a "behind the scenes look at [the] Buy PD system."  Buying Summit Defendants showed Ms. Grigsby and Mr. Taylor houses that had purportedly been purchased, rehabilitated, and rented through BuyPD.

85.     At the same time, Buying Summit Defendants represented to Ms. Grigsby and Mr. Taylor that they, too, could purchase similar properties during the Buying Summit that BuyPD had already rehabbed, rented, and managed.

86.     At the time the representations were made, Buying Summit Defendants knew that many of the properties available for purchase at the Buying Summit were neither rehabbed nor rented and that the management of the properties came with onerous fees and terms.

87.     During the Diamond Tour, Buying Summit Defendants also distributed a workbook ("Diamond Tour Workbook") to Ms. Grigsby and Mr. Taylor containing slides that they utilized and discussed throughout the two-day Diamond Tour.

88.     Like prior materials drafted by the Seminar Defendants, the Diamond Tour Workbook was drafted by Buying Summit Defendants to induce victims to place their trust in Buying Summit Defendants and to view their relationships with Buying Summit Defendants as a partnership.

89.     For example, Buying Summit Defendants utilized a series of slides describing a

"Power Team" that was said to include realtors, contractors and property managers and enthusiastically represented to Ms. Grigsby and Mr. Taylor that "BuyPD is your power team!" In the note sections of the workbook, Ms. Grigsby wrote at least two times, "BuyPD is my power team!"

90.     Utilizing and discussing the Diamond Tour workbook, representatives of BuyPD also represented to Ms. Grigsby and Mr. Taylor that the upcoming Buying Summit was a ready-made alternative to the onerous process of "[w]ork[ing] your own deals."

91.     For example, BuyPD representatives told participants the following:

a.   The Buying Summit is an opportunity to "[p]urchase cash flow ready assets" that will lead to an "[i]mmediate increase of net worth" through "[l]ittle effort;"

b.   By purchasing cash flow ready assets at the Buying Summit, purchasers avoid having to implement the techniques taught by Seminar Defendants throughout their training: "No 25:1" (Defendants previously instructed students that they needed to make 25 offers to get one acceptance), "No rehabbing," "No qualifying tenants," and "No self management."

92.     The Las Vegas Diamond Tour was used by Buying Summit Defendants to deceive victims into purchasing properties at the Buying Summit.

93.     On March 13 through 15, 2015, Ms. Grigsby and Mr. Taylor attended the Buying Summit where they were encouraged to purchase real estate and other services from the Buying Summit Defendants and their affiliates, including Veil Corporate and John Graham Property Management.

94.     As with the previous programming events, Buying Summit Defendants distributed a workbook (the "Buying Summit Workbook") to Ms. Grigsby and Mr. Taylor that contained slides that were utilized and discussed throughout the Buying Summit.

95.     The Buying Summit Workbook was drafted with the intent of inducing Buying Summit victims to purchase properties by emphasizing the ease of doing it "with BuyPD" as compared to the onerous process of "[d]oing it on your own."

96.     For example, the Buying Summit Workbook included the following representations about the ease purchasing property with BuyPD:

    a.  Buy PD conducts "[m]arket [r]esearch;"

    b.  BuyPD knows the "[l]ocal [r]ules & [r]egulations;"

    c.  BuyPD properties are superior for their "[n[eighborhood [s]election"

    d.  BuyPD has "[t]rusted [i]nformants;" and "[i]nside [i]nformation;"

    e.  BuyPD has a "[r]eliable [t]eam on the [g]round ([p]rofessionals)" that includes "[c]ontractors," "[i]nspectors," "[i]nsurance [p]rovider," "[r]ealtor," "[t]itle [c]ompany;" and "[r]eputable [p]roperty [m]anager;"

    f.  Purchasing property from BuyPD saves valuable "[t]ime;" and

    g.  In contrast, the Buying Summit Workbook warned that when "[d]oing it on your own," you "[r]isk being taken advantage of."

97.     During the Buying Summit, Buying Summit Defendants represented that they had a proprietary algorithm to identify geographical areas where properties were undervalued and would appreciate in value.  Buying Summit Defendants also represented that they would tell Ms. Grigsby and Mr. Wade the "right time to sell" to maximize gains.

19

98.     During the Buying Summit, Buying Summit Defendants also made a number representations about the "[l]ogisitics of [b]uying [a]ssets" from BuyPD at the Buying Summit, including:

    a.   BuyPD conducts due diligence on all properties for sale, which includes:

        i.   "[f]ull [p]hysical [i]nspection,"

        ii.   "[f]ull [t]itle [i]nspection," and

        iii.   "[v]erify [l]ease and [t]enants."

    b.   Properties are "[p]urchase[d] in [BuyPD's] [n]ame;"

    c.   "Title [r]ecorded in [BuyPD's] LLC [n]ame."

    d.   "Guardian Law [o]rders Title Commitment;" and

    e.   "Title [i]nsurance [i]ncluded on [e]very [p]roperty [s]old;"

99.     Buying Summit Defendants also drafted the following misrepresentations about the land available for sale at the Buying Summit:

    a.   "Fully Developed;"

    b.   "Buy Below Development Costs;" and

    c.   "Low Entry Prices."

100.     Relying on the false and misleading representations made by Seminar Defendants and Buying Summit Defendants, Ms. Grigsby and Mr. Taylor purchased two properties in Illinois, one property in Michigan, and one land parcel in Florida from BuyPD and/or Income Property USA while attending the Las Vegas Buying Summit.  Specific factual allegations concerning each sale are described in turn within.

101.     During the Buying Summit, all of the hundreds of participants, including Ms.

Grigsby and Mr. Taylor, would be called one at a time to a back room over a loudspeaker to meet with their salesman, who in this case was Lars Johnson.  Lars Johnson selected the properties discussed hereafter, and pressured Ms. Grigsby and Mr. Taylor to purchase those properties.  At no time were Ms. Grigsby and Mr. Taylor allowed to choose which properties to evaluate.  Once a victim purchased a property, they were given a lanyard with a medallion identifying them as having made a purchase, and then sent back out to the convention room to await another callback.  These medallions were for the purpose of instilling a "competition to purchase" and peer pressure to buy properties.

102.   At the same time, having relied upon Seminar Defendants representations, Ms. Grigsby and Mr. Taylor purchased the "Veil Maintenance Program" for $7,095 plus $34.95 per month every month thereafter from Veil Corporate on March 14, 2015 while attending the Buying Summit.

103.   Agents of Veil represented that the product included "asset protection," "tax strategies," and "website updates, access to forms, documents, blueprint, registered agent services and access to a personal consultant for help when necessary."

104.   Based upon the fact that Guardian Law had previously "fulfilled" legal services for Veil Corporate, Guardian Law is believed to have committed to provide some of these legal services and benefitted from this purchase as well.

105.   The Buying Summit was the three-day culmination of Defendants' scheme to defraud whereby Defendants deceived Ms. Grigsby and Mr. Taylor into believing that the properties available were rehabbed, rented, and available at well below market value and pressured participants into purchasing multiple properties, land parcels, and loans.

21

### The Calumet City Property

#### *Background on the Calumet City Property*

106.     In or around 1952, a 732 square foot house was built on the real estate commonly known as 27 163rd Street, Calumet City, Illinois 60409 (the "Calumet City Property").

107.     The last resident-owner of the Calumet City Property lost the property to foreclosure in 2013.  After the foreclosure, the Calumet City Property was transferred to the United States Department of Housing and Urban Development ("HUD").

108.     On or about January 22, 2015, HUD sold the Calumet City Property to John Graham, Inc., an Illinois limited liability company, for an estimated $36,000.00.  The deed was recorded four months later on May 18, 2015.

109.     On information and belief, on or about March 27, 2015—two weeks *after* the Las Vegas Buying Summit—John Graham, Inc. transferred the Calumet City Property to Improvement Homes LLC.  The deed was recorded eight months later on November 23, 2015.

#### *BuyPD Misrepresents Material Conditions of the Calumet City Property*

110.     On March 13, 2015, Lars Johnson ("Johnson") and Natalie Mecham ("Mecham"), Buying Summit "Property Specialists" and agents and employees of BuyPD, recommended that Ms. Grigsby and Mr. Taylor, as the managers of LMW, purchase the Calumet City Property as an investment property.

111.     To induce Ms. Grigsby and Mr. Taylor to put the property under contract, Johnson and Mecham made the following representations on behalf of Buying Summit Defendants and Improvement Homes concerning the Calumet City Property:

    a.   The property had been "rehabbed;"

22

     b.   An inspection had been completed;

     c.   The inspection revealed no issues;

     d.   The property came with a rental guarantee;

     e.   The property was worth more than $80,000;

     f.   The property was being offered well below market value;

     g.   Comparable properties nearby recently sold for $85,000 to $130,000; and

     h.   That Ms. Grigsby and Mr. Taylor needed to purchase the property quick or else Johnson would have to move on to the next Buying Summit attendee.

112.    Johnson further represented that the Buying Summit Defendants and Improvement Homes had already done the due diligence on behalf of Plaintiffs for the Calumet City Property to ensure that it was a great investment for their Buying Summit VIPs.

113.    At this point in the scheme, Plaintiffs viewed Johnson and Defendants as their "Power team"—agents acting on Plaintiffs behalf and in their best interests.  Defendants intended this belief, and had intentionally created it with their prior actions.

114.    These representations were not true when Johnson made them.  The property was not "rehabbed" and required substantial repairs simply to meet code.  No inspection had been made, and the property was being sold well above market value and was not worth the value represented by Buying Summit Defendants.

115.    At the same time, Johnson provided Ms. Grigsby and Mr. Taylor with a "Property Analysis Report" on the Calumet City Property that indicated it was prepared by Johnson on March 13, 2015.

116.    Included in the Property Analysis Report was a "Comparative Market Analysis" for the Calumet City Property that was prepared by Johnson on behalf of Buying Summit Defendants and Improvement Homes with the intent of misleading Ms. Grigsby and Mr. Taylor into purchasing the property.

117.    The Comparative Market Analysis included the following representations:

a.   "This report contains selected sales that are similar (comparable) to the subject property;" and

b.    "All research conducted is using recent property sale within a given area where the property has similar or comparable property characteristics."

118.    On information and belief, the report did not include comparable properties with similar property characteristics; the research criteria omitted property characteristics and property conditions; and the purported "comparables" were actually identified by searching for residential properties that had sold at or around $80,000 (the inflated price BuyPD wanted to obtain for the property) within the last twelve months within a one mile radius.

119.    On information and belief, the Comparative Market Analysis provided by Johnson intentionally misstated the value of the property and was prepared with the intent of misleading Ms. Grigsby and Mr. Taylor into purchasing the Calumet City Property.

120.    Also included in the Property Analysis Report was a "Property Condition Report" on the Calumet City Property that purported to describe the results of a 126-point home inspection.  All items present in the home were described as "lnspected.  Appears Good or Working Condition," and there were no repair items noted.  In actual fact, the Calumet City Property was generally in poor condition and required a number of repairs to be made.

121.     The Property Condition Report provided by Johnson on behalf of Buying Summit Defendants and Improvement Homes was not based upon an actual inspection of the Calumet City Property, was a form document identical in all respects to the inspection reports provided on the Sauk Village and Ferndale Properties, and was prepared with the intent of misleading Ms. Grigsby and Mr. Taylor into purchasing the Calumet City Property.

122.     Also included in the Property Analysis Report was a Title Summary bearing Guardian Law's name, but also purportedly prepared by Johnson.  The Title Summary listed the title owner of the Calumet City Property as Improvement Homes, LLC.

123.     The Title Summary did not accurately identify the state of title at the time it was made and omitted numerous entries in the chain of title to the property.

124.     On information and belief, the Title Summary was included in the Property Analysis Report for the purpose of misleading Ms. Grigsby and Mr. Taylor into purchasing the Calumet City Property.

125.     In reliance on Defendants' representations and the Property Analysis Report, Ms. Grigsby and Mr. Taylor, as the managers of LMW, placed the Calumet City Property under contract for the purchase price $78,750.00 while at the Buying Summit on March 13, 2015.

126.     The purchase price far exceeded the actual value of the property.

127.     Johnson did not explain the purchase contract or its terms, but rather pressured Ms. Grigsby and Mr. Taylor to sign quickly and without reading the contract, or he would offer the property to someone else.  Johnson stated that he was "on their side" and was part of their team, and that they should trust him.

128.    Johnson also stated that Defendants guaranteed that the property would be rented and rehabbed.

129.    Plaintiffs were required by Buying Summit Defendants to use Guardian Law for title services, and were not provided any disclosures about the affiliations between the Defendants, who were receiving funds from the settlement charges at closing.

### The Closing of the Fraudulent Sale of the Calumet City Property

130.    On or around April 14, 2015, the parties closed on the Calumet City Property. The purchase price was $78,750.00 plus an additional $8,503.20 in settlement charges.

131.    The additional settlement charges include charges for the fraudulent title work, onerous loan origination fees, and other items that all went to participants in this fraudulent scheme.

132.    The sale transaction was structured as a $28,723.00 down payment from Plaintiffs to Improvement Homes, plus a loan from Insider's Cash to LMW in the amount of $60,900.00.

133.    LMW was required to use Insider's Cash as the lender for the property, with onerous fees and terms.  Instead of the "competitive rates" and "funding at 1%" previously represented by Defendants, the Note is a three-year interest-only note at 12% interest, with a balloon payment of $60,900 at the end of three years.  Insider's Cash also required a 7.4% "origination fee"—a $4000 dollar additional cost.

134.    Ms. Grigsby and Mr. Taylor, as the managing members of LMW, were also required by Buying Summit Defendants and Insider's Cash to sign a "Durable Power of Attorney for a Limited Power Appointment."  In the case of default, the limited power appointment assigns Darren Eady of Insider's Cash the power to execute a warranty deed on LMW's behalf

26

that transfers the Calumet City Property to Insider's Cash, essentially avoiding formal foreclosure proceedings.

135.    LMW was also required to employ Lift Property Management as the property manager for the property, with onerous fees and terms.

136.    LMW was further required to open a "trust" bank account to hold all rental proceeds from the property, from which Insider's Cash would electronically draw monthly loan payments, and Lift Property Management would electronically draw its fees.

137.    On information and belief, Insider's Cash immediately attempted to sell the note to another of BuyPD's victims at a Buying Summit.

### Defendants Fail to Provide Record Title and Mislead Plaintiffs about Recording

138.    Following closing on the Calumet City Property, Buying Summit Defendants represented to Ms. Grigsby and Mr. Taylor, as the managers of LMW, that title to the Calumet City Property would be recorded in four to six weeks.  At that time, Plaintiffs would begin receiving rents on the Calumet City Property.

139.    When the deed failed to be recorded within this time frame, Mr. Taylor reached out to Buying Summit Defendants, Guardian Law, and Lift Property Management via email to determine the status of recording.

140.    In response, Plaintiffs were lied to regarding the state of title.  Specifically, Defendants made representations via email about the recording of the property, including but not limited to the following:

        a.   On November 18, 2015, Jessi Warnick ("Warnick"), an agent and employee of Guardian Law, represented to Mr. Taylor, "I have checked with our

recorders in the state.  We have sent the recorder the funds already and they are saying that they will have these recorded this week."

b. On December 2, 2015, Warnick emailed Mr. Taylor and explained that Guardian Law had "checked in with the recorders who are handling getting this recorded and it looks like it did not pass inspection.  Buypd is correcting those items.  BuyPD might have more information on the inspection if you are wanting to know more about that."

c. On December 3, 2015, Dallin Clemins ("Clemins"), an agent and employee of BuyPD, represented to Mr. Taylor via email that BuyPD was not "not seeing anything regarding a failed inspection."

d. On February 17, 2016, Buying Summit Defendants emailed Mr. Taylor and Ms. Grigsby and represented, "Your deed [to the Calumet City Property] has recorded and a copy of it is attached in this email."

141.    These representations were false and misleading when made, and omitted necessary information to correct their misleading nature.  Defendants knew the deed from John Graham Inc. to Improvements Home had not yet recorded, that the property would not be recorded until that time, that as of February 17, 2016 the property still had not recorded, and that the deed purporting to be a copy of LWM's recorded deed was actually a copy of the deed transferring title of the property from John Graham Inc. to Improvement Homes.

142.    Defendants made these representations with the intent of misleading Plaintiffs into believing the property would be recorded "any day now" and preventing Plaintiffs from

receiving rents on the property or acting on their contractual right to cancel and rescind the contract.

143.    On October 12, 2016, Debra Coble, an attorney acting on behalf of Ms. Grigsby, Mr. Taylor, and LMW, emailed BuyPD to give notice that Plaintiffs sought to exercise their contractual right to rescind the contract as BuyPD had been unable to secure a clear deed in the 18 months since the Calumet Property closed.

144.    On October 21, 2016, the deed transferring title from Improvement Homes to LMW was recorded.

### Calumet City Property Needs Substantial Rehabilitation and Repairs

145.    The Calumet City Property was untenanted and/or did not generate the guaranteed rental income from the date Plaintiffs purchased the Property.

146.    BuyPD had an existing legal obligation to reimburse Ms. Grigsby and Mr. Taylor for rent they did not receive.

147.    In late 2015, Ms. Grigsby and Mr. Taylor contacted BuyPD to obtain the guaranteed rent reimbursement.

148.    In response, BuyPD sought to deceive Plaintiffs into signing a release of claims by informing Ms. Grigsby and Mr. Taylor that they were required to sign a form immediately in order to receive the rental reimbursement.

149.    The terms of the agreement were never discussed or negotiated with the Plaintiffs. BuyPD sought to hide the release of claims by characterizing it as "a release of funds form"--one last minor formality related solely to that particular reimbursement that was required for Plaintiffs to receive their duly owed compensation.

150.    This form was part of the fraudulent real estate sales scheme, combined with a confusing web of interrelated companies to frustrate the discovery of facts and prevent Plaintiffs from exercising their rights and remedies under the operative agreements.

151.    In reliance on BuyPD's misleading statements and omissions, Plaintiffs were induced to sign the form on or around November 2015 in order to receive the rent reimbursement they were already owed.

152.    The sole consideration for the release of claims was the rent income that BuyPD was already obligated to supply.

### The Sauk Village Property

### *Background on the Sauk Village Property*

153.    In or around 1970, a 980 square foot house was built on the real estate commonly known as 2017 215th Pl., Sauk Village, Illinois 60411 (the "Sauk Village Property").

154.    The last resident-owner of the Sauk Village Property lost the property to foreclosure in 2012.  After the foreclosure, the Sauk Village Property was transferred to the Federal National Mortgage Association ("Fannie Mae").

155.    On or about December 22, 2014, upon information and belief, Fannie Mae sold the Sauk Village Property to John Graham, Inc. ("John Graham"), a domestic corporation incorporated in Michigan, for an estimated $24,000.00.  The next month, John Graham recorded the deed on January 15, 2015.  That deed restricted flipping the property for more than $28,800 for the succeeding three months, a restriction running with the land.

156.    On or about February 24, 2015, on information and belief, John Graham sold the Sauk Village Property to Interactive Homes.  Eight months later, the deed was recorded on October 21, 2015.

***BuyPD Misrepresents Material Conditions of the Sauk Village Property***

157.    On March 13, 2015, Johnson also recommended that Ms. Grigsby and Mr. Taylor, as the managers of LMW, purchase the Sauk Village Property as an investment property.

158.    To induce Ms. Grigsby and Mr. Taylor to put the property under contract, Johnson made the following representations on behalf of Buying Summit Defendants concerning the Sauk Village Property:

    a.   The property had been "rehabbed;"

    b.   An inspection had been completed;

    c.   The inspection revealed no issues;

    d.   The property was "rent-ready;"

    e.   The property was worth more than $95,000;

    f.   The property was being offered well below market value; and

    g.   Comparable properties nearby recently sold for $110,000 to $130,000.

159.    Johnson further represented that Buying Summit Defendants had already done the due diligence on behalf of the Plaintiffs for the Sauk Village Property to ensure that it was a great investment for their Buying Summit VIPs.

160.    At this point in the scheme, Plaintiffs viewed Johnson and Defendants as their "Power team"—agents acting on Plaintiffs behalf and in their best interests.  Defendants intended this belief, and had intentionally created it with their prior actions.

161.    These representations were not true when Johnson made them.  The property was not "rehabbed" and required substantial repairs simply to meet code.  No inspection had been made, and the property was being sold well above market value and was not worth the value represented by Buying Summit Defendants.

162.    At the same time, Johnson provided Ms. Grigsby and Mr. Taylor with a "Property Analysis Report" on the Sauk Village Property that indicated it was prepared by Johnson on March 13, 2015.

163.    Included in the Property Analysis Report was a "Comparative Market Analysis" for the Sauk Village Property that was prepared by Johnson on behalf of Buying Summit Defendants and Interactive Homes with the intent of misleading Ms. Grigsby and Mr. Taylor into purchasing the property.

164.    The Comparative Market Analysis included the following representations:

    a.    "All research conducted is using recent property sale within a given area where the property has similar or comparable property characteristics;" and

    b.    "This report contains selected sales that are similar (comparable) to the subject property."

165.    The report did not include comparable properties with similar property characteristics, the research criteria omitted property characteristics and property conditions, and the purported "comparables" were actually identified by searching for residential properties that had sold at or around $95,600 (the inflated amount BuyPD wanted to obtain) within the last twelve months within a one mile radius.

166.     On information and belief, the Comparative Market Analysis provided by Johnson on behalf of Buying Summit Defendants and Interactive Homes intentionally misstated the value of the property and was prepared with the intent of misleading Ms. Grigsby and Mr. Taylor into purchasing the Sauk Village Property.

167.     Also included in the Property Analysis Report was a "Property Condition Report" on the Sauk Village Property that purported to describe the results of a 126-point home inspection.  All items present in the home were described in the report as "lnspected.  Appears Good or Working Condition," and there were no repair items noted.  In actual fact, the Sauk Village Property was generally in poor condition and required a number of repairs to be made.

168.     The Property Condition Report provided by Johnson on behalf of Buying Summit Defendants and Interactive Homes was not based upon an actual inspection of the Sauk Village Property, was merely a form document identical in all respects to the inspection reports provided on the Calumet City and Ferndale Properties, and was prepared with the sole intent of misleading Ms. Grigsby and Mr. Taylor into purchasing the Sauk Village Property.

169.     Also included in the Property Analysis Report was a Title Summary bearing Guardian Law's name, but also purportedly prepared by Johnson.  The Title Summary listed the title owner of the Sauk Village Property as Interactive Homes, LLC.

170.     The Title Summary did not accurately identify the state of title at the time it was made and omitted several entries in the chain of title to the property.

171.     On information and belief, the Title Summary was included in the Property Analysis Report for the purpose of misleading Ms. Grigsby and Mr. Taylor into purchasing the Sauk Village Property.

172.     In reliance on Defendants' representations and the Property Analysis Report, Ms. Grigsby and Mr. Taylor, as the managers of LMW, placed the Sauk Village Property under contract for the purchase price of $94,350.00 while at the Buying Summit on March 13, 2015. This transfer violated the restrictions in the deed from Fannie Mae to John Graham.

173.     The purchase price far exceeded the actual value of the property.

174.     Johnson did not explain the purchase contract or its terms, but rather pressured Ms. Grigsby and Mr. Taylor to sign quickly and without reading the contract, or he would offer the property to someone else.  Johnson stated that he was "on their side" and was part of their team, and that they should trust him.

175.     Johnson also stated that Defendants guaranteed that the property would be rented and rehabbed.

176.     At the same time, Plaintiffs were required to sign a Limited Power of Attorney that appointed Sandra D. Davis, of the law firm American Legal & Escrow, LLC—a Nevada limited liability company with Blair Jackson, BuyPD's registered agent, as its sole managing member—the power to sign all documents related to the Sauk Village Property, including any and all closing documents.

177.     Plaintiffs were required by Buying Summit Defendants to use Guardian Law for title services, and were not provided any disclosures about the affiliations between the Defendants, who were receiving funds from the settlement charges at closing.

### The Closing of the Fraudulent Sale of the Sauk Village Property

178.      On or around April 17, 2015, the Sauk Village Property closed.  The purchase price of the property was $94,350, plus an additional $9,633.73 in settlement charges.

34

179.    The additional settlement charges include charges for the fraudulent title work, an onerous 7.75% loan origination fee, and other items that all went to participants in this fraudulent scheme.

180.    The sale transaction was structured as a $33,861.00 down payment from Plaintiffs to Interactive Homes, plus a loan from Insider's Cash to LMW in the amount of $71,900.00.

181.    Instead of the "competitive rates" and "funding at 1%" previously represented by Defendants, the Note is a three-year interest-only note at 12% interest, with a balloon payment of $71,900 at the end of three years.

182.    LMW was also required to employ Lift Property Management as the property manager for the property, with onerous fees and terms.

183.    LMW was further required to open a "trust" bank account to hold all rental proceeds from the property, from which Insider's Cash would electronically draw monthly loan payments, and Lift Property Management would electronically draw its fees.

184.    On information and belief, Insider's Cash immediately attempted to sell the note to another of BuyPD's victims at a Buying Summit.

185.    Six months after the sale, the Sauk Village property was finally recorded in LMW's name on October 21, 2015.

### Sauk Village Property Untenanted and in Need of Substantial Repairs

186.    The Sauk Village Property was untenanted for many months from the date Plaintiffs purchased the Property.

187.    The Sauk Village Property also required numerous repairs that were not identified in the purported inspection.

35

188.    BuyPD had an existing legal obligation to reimburse Ms. Grigsby and Mr. Taylor for rent for the roughly six month period the Sauk Village Property was untenanted, and to compensate Plaintiffs for the cost of the repairs that were required to be made on the Sauk Village Property.

189.    Following the sale of the property, Mr. Taylor wrote several emails to BuyPD concerning rental reimbursement and compensation for repairs.

190.    In response to Mr. Taylor, BuyPD sought to deceive Plaintiffs into signing a release of claims by informing Ms. Grigsby and Mr. Taylor that they were required to sign a form immediately in order to receive the funds.

191.    The terms of the form were never discussed or negotiated with the Plaintiffs. BuyPD sought to hide the release of claims by characterizing it as "a release of funds form"--one last minor formality related solely to that particular reimbursement that was required for Plaintiffs to receive their duly owed compensation.

192.    This form was part of the fraudulent real estate sales scheme, combined with a confusing web of interrelated companies to frustrate the discovery of facts and prevent Plaintiffs from exercising their rights and remedies under the operative agreements.

193.    In reliance on BuyPD's misleading statements, Plaintiffs were induced to sign the form on or around November 2, 2015 in order to receive the payment they were already owed.

194.    The sole consideration for the release of claims was the rent income that BuyPD was already obligated to supply.

### The Ferndale Property

#### *Background on the Ferndale Property*

195.    In 1948, a 972 square foot house was built on the real estate commonly known as 21357 Reimanville Avenue, Ferndale, Michigan 48220 (the "Ferndale Property").

196.    On information and belief, the property was foreclosed in 2014 and subsequently sold to Expansion Properties, a Utah limited liability company and captive subsidiary of Income Property USA.  The deed was recorded on June 4, 2015, more than two months after BuyPD sold the Ferndale Property to Plaintiffs at the Buying Summit.

#### *BuyPD Misrepresents Material Conditions of the Ferndale Property*

197.     On March 13, 2015, Johnson also recommended that Ms. Grigsby and Mr. Taylor, as the managers of LMW, purchase the Ferndale Property as an investment property.

198.    To induce Ms. Grigsby and Mr. Taylor to put the property under contract, Johnson made the following representations on behalf of Buying Summit Defendants and Expansion Properties concerning the Ferndale Property:

    a.   The property had been "rehabbed,"

    b.   An inspection had been completed;

    c.   The inspection revealed no issues;

    d.   The property was worth more than $82,000;

    e.   The property was being offered well below market value;

    f.   Comparable properties nearby sold for $77,000 to $108,000; and

199.   Johnson further represented that Buying Summit Defendants and Expansion Properties had already done the due diligence on behalf of Plaintiffs for the Ferndale Property to ensure that it was a great investment for their Buying Summit VIPs.

200.   At this point in the scheme, Plaintiffs viewed Johnson and Defendants as their "Power team"—agents acting on Plaintiffs behalf and in their best interests.  Defendants intended this belief, and had intentionally created it with their prior actions.

201.   These representations were not true when Johnson made them.  The property was not "rehabbed" and required substantial repairs simply to meet code.  No inspection had been made, and the property was being sold well above market value and was not worth the value represented by Buying Summit Defendants.

202.   At the same time, Johnson provided Ms. Grigsby and Mr. Taylor with a "Property Analysis Report" on the Ferndale Property that indicated it was prepared by Johnson on March 13, 2015.

203.   As with the other properties, included in the Property Analysis Report was a "Comparative Market Analysis" for the Ferndale Property that was prepared by Johnson on behalf of Buying Summit Defendants and Expansion Properties with the intent of misleading Ms. Grigsby and Mr. Taylor into purchasing the property.

204.   The Comparative Market Analysis for the Ferndale Property included the following representations:

> a.   "This report contains selected sales that are similar (comparable) to the subject property;" and

b.  "All research conducted is using recent property sale within a given area where the property has similar or comparable property characteristics;"

205.    The report did not include comparable properties with similar property characteristics, the research criteria omitted property characteristics and property conditions, and the purported "comparables" were actually identified by searching for residential properties that had sold at or around $82,000 (the inflated amount BuyPD wanted to obtain) within the last twelve months within a one mile radius.

206.    On information and belief, the Comparative Market Analysis  provided by Johnson intentionally misstated the value of the property and was prepared by Johnson with the intent of misleading Ms. Grigsby and Mr. Taylor into purchasing the Ferndale Property.

207.    Also included in the Property Analysis Report was a "Property Condition Report" on the Ferndale Property that purported to describe the results of a 126-point home inspection. All items present in the home were described as "lnspected.  Appears Good or Working Condition," and there were no repair items noted.  In actual fact, the Ferndale Property was generally in poor condition and required a number of repairs to be made.

208.    The Property Condition Report provided by Johnson on behalf of Buying Summit Defendants and Expansion Properties was not based upon an actual inspection of the Ferndale Property, was merely a form document identical in all respects to the inspection reports provided on the Calumet City and Sauk Village Properties, and was prepared with the intent of misleading Ms. Grigsby and Mr. Taylor into purchasing the Ferndale Property.

209.     Also included in the Property Analysis Report was a Title Summary bearing Guardian Law's name, but also purportedly prepared by Johnson.  The Title Summary listed the title owner of the Ferndale Property as Expansion Properties, LLC.

210.     The Title Summary did not accurately identify the state of title at the time it was made and omitted several entries in the chain of title to the property.

211.     On information and belief, the Title Summary was included in the Property Analysis Report for the purpose of misleading Ms. Grigsby and Mr. Taylor into purchasing the Ferndale Property.

212.     In reliance on Defendants' representations and the Property Analysis Report, Ms. Grigsby and Mr. Taylor, as the managers of LMW, placed the Ferndale Property under contract for $80,750.00 while at the Buying Summit on March 13, 2015.

213.     The purchase price far exceeded the actual value of the property.

214.     Johnson did not explain the purchase contract or its terms, but rather pressured Ms. Grigsby and Mr. Taylor to sign quickly and without reading the contract, or he would offer the property to someone else.  Johnson stated that he was "on their side" and was part of their team, and that they should trust him.

215.     Johnson also stated that Defendants guaranteed that the property would be rented and rehabbed.

216.     At the same time, Plaintiffs were required to sign a Limited Power of Attorney that appointed Sandra D. Davis, of the law firm American Legal & Escrow, LLC—a Nevada limited liability company with Blair Jackson, BuyPD's registered agent, as its sole managing

member—the power to sign all documents related to the Ferndale Property, including closing documents.

217.    Plaintiffs were required by Buying Summit Defendants to use Guardian Law for title services, and were not provided any disclosures about the affiliations between the Defendants, who were receiving funds from the settlement charges at closing.

### The Closing of the Fraudulent Sale of the Ferndale Property

218.    On or around April 23, 2015, the Ferndale Property closed.  The purchase price of the property was $80,750.00, plus an additional $9,079.30 in settlement charges.

219.    The additional settlement charges include charges for the fraudulent title examination, an onerous 7.75% loan origination fee, and other items that all went to participants in this fraudulent scheme.

220.    The sale transaction was structured as a $28,713.00 down payment from Plaintiffs to Improvement Homes, plus a loan from Insider's Cash to LMW in the amount of $60,900.00. Included in the amount of the Loan was $4,573.70 for loan origination.

221.    Instead of the "competitive rates" and "funding at 1%" previously represented by Defendants, the Note is a three-year interest-only note at 12% interest, with a balloon payment of $60,900 at the end of three years.

222.    Buying Summit Defendants and Insider's Cash required Ms. Grigsby and Mr. Taylor, as the managing members of LMW, to each sign a "Durable Power of Attorney for a Limited Power Appointment."  In the case of default, the limited power appointment assigns Darren Eady of Insider's Cash the power to execute a warranty deed on LMW's behalf that transfers the Ferndale Property to Insider's Cash, essentially avoiding formal foreclosure

proceedings.

223.    LMW was also required to employ Lift Property Management as the property manager for the property, with onerous fees and terms.

224.    LMW was further required to open a "trust" bank account to hold all rental proceeds from the property, from which Insider's Cash would electronically draw monthly loan payments, and Lift Property Management would electronically draw its fees.

225.    On information and belief, Insider's Cash immediately attempted to sell the note to another of BuyPD's victims at a Buying Summit.

226.    The Ferndale property was recorded in LMW's name on June 04, 2015.

*Ferndale Property Requires Substantial Rehabilitation and Repairs*

227.    The Ferndale Property also required substantial rehabilitation and repairs that were not identified in the purported inspection.

228.    Not long after the purchase of the property, Plaintiffs learned that the city would not allow the property to be rented, indeed would not allow it to be occupied at all, without the necessary repairs.  Mr. Taylor contacted BuyPD to request reimbursement for the repairs and lost rent.

229.    BuyPD  had an existing legal obligation to compensate Plaintiffs for the cost of the repairs that were required to be made on the Ferndale Property and the lost rental income

230.    In response to Mr. Taylor, BuyPD sought to deceive Plaintiffs into signing a release of claims by informing Ms. Grigsby and Mr. Taylor that they were required to sign a form immediately in order to receive the funds.

231.     The terms of the form were never discussed or negotiated with the Plaintiffs. BuyPD sought to hide the release of claims by characterizing it as "a release of funds form"--one last minor formality related solely to that particular reimbursement that was required for Plaintiffs to receive their duly owed compensation.

232.      This form was part of the fraudulent real estate sales scheme, combined with a confusing web of interrelated companies to frustrate the discovery of facts and prevent Plaintiffs from exercising their rights and remedies under the operative agreements.

233.     In reliance on BuyPD's statements and omissions, Plaintiffs signed the release of funds on May 26, 2016 in order to avoid any further delays in rehabbing.

234.     The sole consideration for the release of claims was the repair costs that BuyPD already had a legal obligation to provide.

## The North Port Lot

### Background on the North Port Lot

235.     Lot 27 Valentine St. North Port, Florida, 34388 (the "North Port Lot") is a 10,000 square foot (.23 acre) vacant lot located in the Port Charlotte Subdivision.

236.     On information and belief, Tarpon Properties, LLC sold IvyVest Properties, a Utah limited liability company managed by Income Property USA, 30 vacant lots in the Port Charlotte subdivision, including the North Port Lot in or around February 2014.

### BuyPD Misrepresents Material Conditions of the North Port Land

237.      On March 13, 2015, Johnson recommended that Ms. Grigsby and Mr. Taylor, as the managers of LMW, purchase the North Port Lot as an investment property.

238.    To induce Ms. Grigsby and Mr. Taylor to put the property under contract, Johnson made the following representations on behalf of Buying Summit Defendants and IvyVest Properties concerning the North Port Lot:

      a.   The North Port Lot was worth more than $10,340; and

      b.   The North Port Lot was being offered well below market value;

239.    These representations were not true when Johnson made them.  The property was being sold well above market value and was not worth the value represented by Buying Summit Defendants.

240.    At this point in the scheme, Plaintiffs viewed Johnson and Defendants as their "Power team"—agents acting on Plaintiffs behalf and in their best interests.  Defendants intended this belief, and had intentionally created it with their prior actions.

241.    In reliance on Defendants' representations, Ms. Grigsby and Mr. Taylor, as the managers of LMW, placed the North Port Lot under contract for $9,340.00.

242.    Johnson did not explain the purchase contract or its terms, but rather pressured Ms. Grigsby and Mr. Taylor to sign quickly and without reading the contract, or he would offer the property to someone else.  Johnson stated that he was "on their side" and was part of their team, and that they should trust him.

243.    The purchase price far exceeded the actual value of the property.

244.    At the same time, Plaintiffs were required to sign a Limited Power of Attorney that appointed Sandra D. Davis, of the law firm American Legal & Escrow, LLC—a Nevada limited liability company with Blair Jackson, BuyPD's registered agent, as its sole managing

member—the power to sign all documents related to the North Port Lot, including closing documents.

245.     Plaintiffs were also required by Buying Summit Defendants to use Guardian Law for title services, and were not provided any disclosures about the affiliations between the Defendants, who were receiving funds from the settlement charges at closing.

### *The Closing of the Fraudulent Sale of the North Port Land*

246.     On or around April 16, 2015, the North Port Lot closed.  LMW paid $9,340.00 plus an additional $650.00 in closing costs for a total of $9,900.

247.     The North Port Lot was recorded in LMW's name on April 28, 2015.

### COUNT I

### Racketeering Influenced and Corrupt Organizations Act – 18 U.S.C. § 1962(c)

### (*All Defendants*)

248.     As discussed in detail above, Defendants designed a fraudulent real estate scheme whereby Defendants induced Plaintiffs to purchase distressed properties at above-market prices.

249.     Defendants, along with others known and unknown, formed an association-in-fact constituting an "Enterprise" within the meaning of 18 U.S.C. § 1961(4) whereby Defendants have coordinated their efforts and conducted their affairs for at least the past two and half years, with the likelihood of future continuance, in order to achieve the shared goal of maximizing profits by defrauding aspiring real estate investors through an elaborate real estate scheme.

250.     The existence of an "enterprise" is demonstrated by the common ownership, operation, and control of each Defendant, as described in paragraphs 6-19.  It is also demonstrated by the integration of the web of companies involved in the real estate sales scheme,

45

including that the same employees took on multiple roles with the different entities in the various phases of this scheme, all as described above.

251.    Each Defendant is a "person" as defined by 18 U.S.C. § 1961(3) and is an entity legally distinct from the Enterprise.

252.    The Defendants agreed to and did conduct and participate in the conduct of the Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.

253.    In furtherance of the fraudulent scheme, the Enterprise engaged in racketeering activity by committing multiple related acts of mail fraud, in violation of 18 U.S.C. § 1341, including the acts described in paragraphs 24-29; wire fraud, in violation of 18 U.S.C. § 1343, including the acts described in paragraphs 71-74, 76-80, and 138-141; and inducement of persons to travel across state lines for the purpose of defrauding them of more than $5,000, in violation of 18 U.S.C. § 2314, as described in paragraphs 50-53, 68-69, 71-74, 80, and 83 *et seq*. (describing the Buying Summit) herein.

254.    The Defendants have directly and indirectly conducted and participated in the conduct of the Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

255.    As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs suffered damages in the amount of the fees and costs of the seminars wherein they were groomed and targeted and the costs and expenses of the fraudulent property purchases, all in an amount to be proven at trial.

256.    Plaintiffs are entitled to attorneys fees.

257.     Plaintiffs are entitled to punitive damages, as the conduct was intentional and reckless.

258.     Plaintiffs are entitled to triple their actual damages as allowed by statute.

## COUNT II

## Civil Conspiracy

### (*All Defendants*)

259.     The Defendants combined and jointly agreed to pursue the object of defrauding aspiring real estate investors across the United States through a fraudulent real estate scheme.

260.     Defendants engaged in one or more unlawful, overt acts in connection with and furtherance of their conspiracy, as alleged herein, including but not limited to the grooming and targeting of Plaintiffs at  real estate education seminars, as alleged in detail in paragraphs 24-70 within; the fraudulent sale of the Calumet City Property, as alleged in detail in paragraphs 101-129 within; the fraudulent sale of the Sauk Village Property, as alleged in detail in paragraphs 153-177 within; the fraudulent sale of the Ferndale Property, as alleged in detail in paragraphs 195-217 within; and the fraudulent sale of the North Port Lot, as alleged in detail in paragraphs 235-245 within.

261.     Defendants' wrongful and unlawful conduct was pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by encouraging, ratifying, or adopting the conduct of each other.

262.     The agreement to further the conspiracy is further demonstrated by the common ownership, operation, and/or control of each Defendant, as described in paragraphs 6-19.  It is also demonstrated by the integration of the web of companies involved in the real estate sales

scheme, including that the same employees took on multiple roles with the different entities in the various phases of this scheme, all as described above.

263.    As a direct and proximate result of the conduct in furtherance of the conspiracy, Plaintiffs have suffered damages in the amount of the fees and costs of the seminars in which they were groomed and targeted and the costs and expenses of the fraudulent property purchases, all in an amount to be proven at trial.

264.    Plaintiffs are entitled to punitive damages, as the conduct was intentional and reckless.

## COUNT III

### Breach of Fiduciary Duty

#### (*BuyPD, Income Property USA, and Guardian Law*)

265.    Guardian Law undertook to provide legal services to Plaintiffs directly related to the transactions at issue and, having created an attorney-client relationship with Plaintiffs, owed duties of care and loyalty to Plaintiffs.

266.    BuyPD and Income Property USA intentionally created a limited agency relationship between themselves and Plaintiffs by repeatedly telling Plaintiffs that they would vet, choose, rehab, and rent properties to Plaintiffs, that they were Plaintiff's "team", and that Pliaintiffs should place their trust in Defendants.  By virtue of this limited agency relationship, BuyPD and Income Property owed duties of care and loyalty to Plaintiffs.

267.    Guardian Law breached the fiduciary duties and obligations it owed Plaintiffs when it misrepresented the title of the subject properties to Plaintiffs, failed to correct its prior misleading statements regarding title, claimed payment at closing for services that were not

performed, and failed to affirmatively inform Plaintiffs of its conflicting interests in the subject transactions and its relationships and other activities with BuyPD and Income Property.

268.    BuyPD and Income Property breached the fiduciary duties and obligations they owed Plaintiffs by self-dealing in its transactions with Plaintiffs within the scope of its limited agency, by misrepresenting the origins, conditions, and value of the properties it sold to Plaintiffs, by failing to fully disclose the nature and terms of the transactions it proposed to Plaintiffs, and by failing to disclose its conflicting interests.

269.    The breaches of fiduciary duty were the proximate cause of Plaintiffs' damages, which include the amount of the fees and costs of the seminars wherein they were groomed and targeted and the costs and expenses of the fraudulent property purchases, all in an amount to be proven at trial.

## COUNT IV

### Fraudulent Inducement – Calumet City

#### (*BuyPD, Income Property USA, Yancey, Education Group, EvTech Media, Improvement Homes, Insider's Cash, and Guardian Law*)

270.    Seminar Defendants made false and misleading oral and written statements about the condition, tenancy, and value of the properties available for purchase at the Buying Summit, representing, among other things, that the Buying Summit properties were rehabbed, in good condition, tenanted or rent-ready, and available for a fair price, as alleged in detail in paragraphs 51, 68-69, 76-79, 84, and 96-98 herein.

271.    Buying Summit Defendants made false and misleading oral and written statements about the condition, tenancy, and value of the Buying Summit properties and the

Calumet City Property in particular, representing, among other things, that the Buying Summit properties were rehabbed and tenanted or rent-ready and that the Calumet City Property was inspected, in good condition, and worth more than $80,000, as alleged in detail in paragraphs 101-129 herein. Buying Summit Defendants omitted to provide information to make their other statements not misleading.

272.     Buying Summit Defendants had an affirmative obligation to disclose all relevant information to Plaintiffs as their limited agents.

273.     As conspirators in the fraudulent real estate seminar scheme, Insider's Cash, Guardian Law, and Improvement Homes are liable for these representations.

274.     These representations and omissions concerned presently existing, material facts.

275.     These representations and omissions were false and misleading.

276.     The Defendants knew the representations and omissions were false or made the representations recklessly, knowing they had insufficient knowledge upon which to base such representations.

277.     The representations and omissions were made for the purpose of inducing Ms. Grigsby and Mr. Taylor, as the manager of LMW, to purchase the Calumet City Property.

278.     Buying Summit Defendants improperly pressured Plaintiffs into making the purchase agreement.

279.     Relying on Defendants misrepresentations regarding the condition, tenancy, and worth of the Calumet City Property, Ms. Grigsby and Mr. Taylor, as the managers of LMW, entered into a purchase contract for the Calumet City Property on March 13, 2015.

280.    Plaintiffs acted reasonably upon the representations and in ignorance of their falsity.

281.    Plaintiffs are entitled to rescission of the sale and/or damages in the amount of the purchase price plus the costs and expenses of the property, all in an amount to be proven at trial.

## COUNT V

### Fraudulent Inducement – Sauk Village

### (*BuyPD, Income Property USA, Yancey, Education Group, Interactive Homes, EvTech Media, Insider's Cash, and Guardian Law*)

282.    Seminar Defendants made false and misleading oral and written statements about the condition, tenancy, and value of the properties available for purchase at the Buying Summit, representing, among other things, that the Buying Summit properties were rehabbed, in good condition, tenanted or rent-ready, and available for a fair price, as alleged in detail in paragraphs 51, 68-69, 76-79, 84, and 96-98 herein.

283.    Buying Summit Defendants made false and misleading oral and written statements about the condition, tenancy, and value of the Buying Summit properties and the Sauk Village Property in particular, representing, among other things, that the Buying Summit properties were rehabbed and tenanted or rent-ready and that the Sauk Village Property was inspected, in good condition, and worth more than $95,000, as alleged in detail in paragraphs 153-177 herein. Buying Summit Defendants omitted to provide information to make their other statements not misleading.

284.    Buying Summit Defendants had an affirmative obligation to disclose all relevant

information to Plaintiffs as their limited agents.

285.    As conspirators in the fraudulent real estate seminar scheme, Insider's Cash, Guardian Law, and Interactive Homes are liable for these representations.

286.    These representations and omissions concerned presently existing, material facts.

287.    These representations and omissions were false and misleading.

288.    The Defendants knew the representations and omissions were false or made the representations recklessly, knowing they had insufficient knowledge upon which to base such representations.

289.    The representations and omissions were made for the purpose of inducing Ms. Grigsby and Mr. Taylor, as the manager of LMW, to purchase the Sauk Village Property.

290.    Buying Summit Defendants improperly pressured Plaintiffs into making the purchase agreement.

291.    Relying on Defendants misrepresentations regarding the condition, tenancy, and worth of the Sauk Village Property, Ms. Grigsby and Mr. Taylor, as the managers of LMW, entered into a purchase contract for the Sauk Village Property on March 13, 2015.

292.    Plaintiffs acted reasonably upon the representations and in ignorance of their falsity.

293.     Plaintiffs are entitled to rescission of the sale and/or damages in the amount of the purchase price plus the costs and expenses of the property, all in an amount to be proven at trial.

**COUNT VI**

**Fraudulent Inducement – Ferndale**

(*BuyPD, Income Property USA, Yancey, Education Group, Expansion Properties, EvTech Media, Insider's Cash, and Guardian Law*)

294.    Seminar Defendants made false and misleading oral and written statements about the condition, tenancy, and value of the properties available for purchase at the Buying Summit, representing, among other things, that the Buying Summit properties were rehabbed, in good condition, tenanted or rent-ready, and available for a fair price, as alleged in detail in paragraphs 51, 68-69, 76-79, 84, and 96-98 herein.

295.    Buying Summit Defendants made false and misleading oral and written statements about the condition, tenancy, and value of the Buying Summit properties and the Ferndale Property in particular, representing, among other things, that the Buying Summit properties were rehabbed and tenanted or rent-ready and that the Ferndale Property was inspected, in good condition, and worth more than $82,000, as alleged in detail in paragraphs 195-217 herein. Buying Summit Defendants omitted to provide information to make their other statements not misleading.

296.    Buying Summit Defendants had an affirmative obligation to disclose all relevant information to Plaintiffs as their limited agents.

297.    As conspirators in the fraudulent real estate seminar scheme, Insider's Cash, Guardian Law, and Expansion Properties are liable for these representations.

298.    These representations and omissions concerned presently existing, material facts.

299.    These representations and omissions were false and misleading.

300.     The Defendants knew the representations and omissions were false or made the representations recklessly, knowing they had insufficient knowledge upon which to base such representations.

301.     The representations and omissions were made for the purpose of inducing Ms. Grigsby and Mr. Taylor, as the manager of LMW, to purchase the Ferndale Property.

302.     Buying Summit Defendants improperly pressured Plaintiffs into making the purchase agreement.

303.     Relying on Defendants misrepresentations regarding the condition, tenancy, and worth of the Ferndale Property, Ms. Grigsby and Mr. Taylor, as the managers of LMW, entered into a purchase contract for the Ferndale Property on March 13, 2015.

304.     Plaintiffs acted reasonably upon the representations and in ignorance of their falsity.

305.      Plaintiffs are entitled to rescission of the sale and/or damages in the amount of the purchase price plus the costs and expenses of the property, all in an amount to be proven at trial.

**COUNT VII**

**Fraudulent Inducement – North Port**

***(BuyPD, Income Property USA, Yancey, Education Group, IvyVest Properties***

***EvTech Media, and Guardian Law)***

306.     Seminar Defendants made false and misleading oral and written statements about the condition and value of the land parcels available for purchase at the Buying Summit, representing, among other things, that the Buying Summit land parcels were available for a fair

price, below development costs, and shovel ready, as alleged in detail in paragraphs 51, 68-69, 76-79, 84, and 99 herein.

307.   Buying Summit Defendants made false and misleading oral and written statements about the condition and value of the Buying Summit land parcels and the North Port Lot in particular, representing, among other things, that the Buying Summit land parcels were available for a fair price, below development costs, and shovel ready and that the North Port Lot was available for below development costs and worth more than $10,340, as alleged in detail in paragraphs 235-245 herein.  Buying Summit Defendants omitted to provide information to make their other statements not misleading.

308.   Buying Summit Defendants had an affirmative obligation to disclose all relevant information to Plaintiffs as their limited agents.

309.   As conspirators in the fraudulent real estate seminar scheme, Guardian Law and IvyVest Properties are liable for these representations.

310.   These representations and omissions concerned presently existing, material facts.

311.   These representations and omissions were false and misleading.

312.   The Defendants knew the representations and omissions were false or made the representations recklessly, knowing they had insufficient knowledge upon which to base such representations.

313.   The representations and omissions were made for the purpose of inducing Ms. Grigsby and Mr. Taylor, as the manager of LMW, to purchase the North Port Property.

314.   Buying Summit Defendants improperly pressured Plaintiffs into making the purchase agreement.

315.     Relying on Defendants misrepresentations regarding the condition, tenancy, and worth of the North Port Lot, Ms. Grigsby and Mr. Taylor, as the managers of LMW, entered into a purchase contract for the North Port Lot on March, 13, 2015.

316.     Plaintiffs acted reasonably upon the representations and in ignorance of their falsity.

317.      Plaintiffs are entitled to rescission of the sale and/or damages in the amount of the purchase price plus the costs and expenses of the property, all in an amount to be proven at trial.

## COUNT VIII

## In the Alternative--Breach of Contract and Duty of Good Faith and Fair Dealing

### (*Improvement Homes*)

318.     Plaintiffs allege the following as an alternative claim to the claims detailed above.

319.     The 2015 Calumet City purchase agreement is a valid agreement binding between LMW and Defendant Improvement Homes.

320.     The Calumet City purchase agreement includes an implied duty of good faith and fair dealing.

321.     LMW fully performed all of its obligations and duties under the Calumet City purchase agreement.

322.     Defendant Improvement Homes, LLC has breached the Calumet City purchase agreement and its implied duty of good faith and fair dealing in at least the following ways:

    a.   By failing to convey clear title at closing after LMW Properties, LLC rendered payment;

    b.   By failing to cure their breaches on demand; and

    c.   By failing to cancel the transaction upon Plaintiffs' proper request after

        Plaintiffs spent reasonable money and time attempting to perfect title.

323.    Defendants' breaches have caused LMW damage in amount to be proven at trial, including without limitation its actual and consequential damages, interest, attorneys fees, costs, and such other and further relief as may be just and equitable under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants as follows:

A.      An award of damages in an amount to be proven at trial;

B.      An award of attorneys fees and costs;

C.      An award of treble damages under Federal law; and

D.      An award of such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Pursuant to Rule 38 of the *Federal Rules of Civil Procedure*, Plaintiffs hereby request trial by jury of all claims and issues triable of right by a jury.

DATED this 18th day of January, 2018.

PARR BROWN GEE & LOVELESS

By:   /s/ Michael D. Black
        Michael D. Black
        Attorneys for Plaintiffs