**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| MARY GRIGSBY, WADE TAYLOR, and LMW PROPERTIES, LLC,<br><br>        Plaintiffs,<br>  v.<br><br>INCOME PROPERTY USA, LLC; BUYPD, LLC; YANCEY, LLC; EVTECH MEDIA, LLC; REAL ESTATE EDUCATION GROUP; IMPROVEMENT HOMES, LLC; INTERACTIVE HOMES, LLC; EXPANSION PROPERTIES, LLC; IVYVEST PROPERTIES, LLC; GUARDIAN LAW, and INSIDER'S CASH, LLC,<br><br>        Defendants. | **MEMORANDUM DECISION AND ORDER ON DEFENDANTS' MOTION TO COMPEL ARBITRATION AND DISMISS PLAINTIFFS' AMENDED COMPLAINT; DEFENDANTS' MOTION TO DISMISS CLAIMS WITH PREJUDICE AND TO ENFORCE SETTLEMENT AGREEMENTS; GUARDIAN LAW'S MOTION TO DISMISS; AND GUARDIAN LAW'S MOTION TO DISMISS AND TO ENFORCE SETTLEMENT AGREEMENTS**<br><br>Case No. 2:17-CV-1110<br><br>Judge Robert J. Shelby |

Plaintiffs Mary Grigsby, Wade Taylor, and LMW Properties, LLC allege Defendants perpetrated a fraudulent real estate scheme. Plaintiffs allege Yancey, EvTech Media, and Real Estate Education Group (the Seminar Defendants) invited Grigsby and Taylor to a seminar at which the Seminar Defendants used high-pressure tactics to upsell investors on real estate workshops. Grigsby and Taylor allege that after the seminar, Income Property, BuyPD, Improvement Homes, Interactive Homes, Expansion Properties, Ivyvest Properties, and Insider's Cash (the Property Defendants) either made fraudulent statements about four pieces of property Plaintiffs agreed to purchase or were responsible for the other Defendants' false statements. Plaintiffs also allege Guardian Law, which they were required to use for title services, made fraudulent statements about the state of the property titles.

Four Motions are before the court: (1) the Seminar Defendants' Motion to Compel Arbitration;[1] (2) the Property Defendants' Motion to Dismiss and Enforce Settlement Agreements;[2] (3) Guardian Law's Motion to Dismiss for Failure to State a Claim;[3] and (4) Guardian Law's second Motion to Dismiss, in which it asks the court to enforce the Property Defendants' settlement agreements.[4] For the reasons discussed below, the Seminar Defendants' Motion to Compel Arbitration is DENIED, the Property Defendants' Motion to Dismiss and Enforce Settlement Agreements is DENIED, Guardian Law's Motion to Dismiss for Failure to State a Claim is GRANTED in part and DENIED in part, and Guardian Law's Motion to Dismiss and Enforce Settlement Agreements is DENIED.

## BACKGROUND[5]

The events giving rise to this case began when the Seminar Defendants sent Grigsby an invitation to attend a free real estate income seminar.[6] The invitation promised to teach Grigsby and a guest "how to get up to $750,000 in pre-approved real estate funding regardless of credit score," how to flip income properties "overnight," and how to "build wealth in real estate."[7] Grigsby registered for the seminar for herself and Taylor.[8]

---

[1] Dkt. 30.

[2] Dkt. 31.

[3] Dkt. 32.

[4] Dkt. 45.

[5] The recitation of facts in this section is solely for purpose of explaining the background of the case and is not intended to resolve any factual issues.

[6] Dkt. 27, ¶ 25.

[7] *Id.* ¶ 28.

[8] *Id.* ¶ 30.

**The Seminar**

Grigsby and Taylor attended the seminar in January 2015.[9]  During the event, the Seminar Defendants encouraged Grigsby and Taylor to purchase real estate workshop packages.[10]  The Seminar Defendants told Grigsby and Taylor the workshops would reveal investing tips and strategies and would provide access to funding and customer support.[11] Grigsby and Taylor allege they were pressured to purchase workshop packages "right then" or "not at all."[12]  Grigsby and Taylor purchased two packages, for which they had to sign purchase orders.[13]  Each purchase order was comprised of a two-sided piece of paper.  On the front, the order stated the signee agreed to the "Terms and Conditions set forth on the reverse side of this Purchase Order."[14]  The Terms and Conditions stated in bold, "Dispute Resolution Program – Binding Arbitration Agreement" and stated the parties "mutually agree that any and all disputes which may arise between them shall be decided exclusively in binding arbitration conducted by the American Arbitration Association."[15]

Later that month, Grigsby and Taylor attended a three-day workshop, at which the Seminar Defendants pressured participants to buy advanced training packages based on each participant's financial means.[16]  Grigsby and Taylor bought the highest-level package and again signed purchase orders with arbitration clauses in the terms and conditions.[17]  Following the

---

[9] *Id.* ¶ 31.

[10] *Id.* ¶¶ 33–38.

[11] *Id.*

[12] *Id.* ¶ 38.

[13] *Id.* ¶ 40.

[14] Dkt. 30, Exs. 1, 2.

[15] *Id.*

[16] Dkt. 27 at ¶ 50.

[17] *Id.* ¶¶ 53–54.

Seminar Defendants' instructions, Grigsby and Taylor also bought asset protection legal services from Veil Corporate, LLC.[18]  Veil Corporate, working with the law firm Guardian Law, set up LMW Properties, LLC for Grigsby and Taylor.[19]

In February 2015, Grigsby and Taylor attended the Seminar Defendants' "Boots on the Ground" training aimed at teaching participants techniques for real estate contract assignment.[20] The Seminar Defendants represented this training involved the use of other people's money and that "No Money Down = 0 Risk."[21]  The Seminar Defendants also presented an alternative to contract assignment, in which Plaintiffs could buy properties that had already been vetted, renovated, rented, and managed.[22]  The Seminar Defendants represented that Insider's Cash would provide lending at competitive rates, and Veil Corporate would provide entity setup and asset protection services.[23]

A few days after the "Boots on the Ground" training, the Seminar Defendants sold Grigsby and Taylor another training program, which promised exclusive VIP access to the best investment properties available at an upcoming Buying Summit.[24]

In March 2015, BuyPD and Income Property USA (the Buying Summit Defendants) sent Grigsby and Taylor a pamphlet titled "An Overview of Real Estate Asset Ownership."[25]  The pamphlet stated the Buying Summit Defendants "find low cost and distressed properties in great neighborhoods," perform repairs, and, when the properties are ready for tenants, resell them to

---

[18] *Id.* ¶ 58.

[19] *Id.* ¶ 60.

[20] *Id.* ¶¶ 62–63.

[21] *Id.* ¶ 64.

[22] *Id.* ¶ 68.

[23] *Id.*

[24] *Id.* ¶¶ 72–74.

[25] Dkt. 76.

clients who "are then able to get great prices without the hassle of doing repairs themselves."[26]

Buying Summit, LLC then sent a series of emails to Grigsby and Taylor assuring them that they would "have adequate time to review the inventory and comfortably sort through the available assets" at a Buying Summit and encouraging them to prepare by moving funds from their retirement accounts.[27]

**The Buying Summit**

In March 2015, Grigsby and Taylor attended the Buying Summit and an advanced training program called the Diamond Tour.[28] The Buying Summit Defendants showed Grigsby and Taylor houses that had purportedly been bought, rehabilitated, and rented through BuyPD.[29] The Buying Summit Defendants represented that Grigsby and Taylor could buy similar properties during the Buying Summit.[30] The Amended Complaint alleges that at the time, the Buying Summit Defendants knew the properties available at the Buying Summit were not rehabilitated or rented and came with "onerous fees and terms."[31] The Buying Summit Defendants also distributed a workbook describing BuyPD as a buyer's "power team."[32] The Buying Summit Defendants told participants they could purchase "cash flow ready assets" that would lead to an "[i]mmediate increase of net worth" through "[l]ittle effort," with "no rehabbing" and "no self management."[33] Throughout the Buying Summit, BuyPD repeatedly stated it was easier for participants to go through BuyPD to buy properties than to do it

---

[26] *Id.* ¶ 78.

[27] *Id.* ¶¶ 80–82.

[28] *Id.* ¶ 83.

[29] *Id.* ¶ 84.

[30] *Id.* ¶ 85.

[31] *Id.* ¶ 86.

[32] *Id.* ¶ 89.

[33] *Id.* ¶ 91.

themselves.[34]  BuyPD stated it conducted market research, knew local rules and regulations, had

trusted informants with inside information, and had a team of contractors, inspectors, an

insurance provider, a realtor, a title company, and a property manager.[35]  BuyPD also stated it

conducts due diligence on all properties it sells, that the land was fully developed, and that

participants could buy below development costs with low entry prices.[36]

During the Buying Summit, Grigsby and Taylor purchased the "Veil Management

Program" from Veil Corporate, which purported to provide asset protection, tax strategies, and

other services.[37]  The Amended Complaint alleges the Buying Summit was designed to be a

high-pressure situation, in which a sales representative called participants back one at a time to a

room to discuss the properties, which the sales representative had preselected.[38]  Grigsby and

Taylor allege their sales representative, Lars Johnson, pressured them to buy the properties

without giving them a chance to choose which properties to evaluate.[39]  Grigsby and Taylor

purchased four properties: (1) Calumet City property in Illinois; (2) Sauk Village property in

Illinois; (3) Ferndale property in Michigan; and (4) North Port lot in Florida.[40]

Grigsby and Taylor bought the Calumet City, Sauk Village, and Ferndale properties

(Rental Properties), based on representations that they had been rehabilitated and inspections had

been completed with no issues.[41]  Employees of BuyPD also told Grigsby and Taylor the Rental

Properties came with rental guarantees and were worth a certain amount of money, and that

---

[34] *Id.* ¶ 95.

[35] *Id.* ¶ 96.

[36] *Id.* ¶¶ 98–99.

[37] *Id.* ¶¶ 102–03.

[38] *Id.* ¶ 101.

[39] *Id.*

[40] *Id.* ¶¶ 125, 172, 212, 241.

[41] *Id.* ¶¶ 111, 158, 198.

Plaintiffs needed to quickly purchase the properties or else another Buying Summit attendee would.[42]  Johnson also represented the Buying Summit Defendants had already done due diligence for the Rental Properties.[43]  Plaintiffs allege these representations were false because the Rental Properties were not rehabilitated but instead required substantial repairs to meet code requirements.[44]  Additionally, Plaintiffs allege the Rental Properties had not been inspected and were not worth as much as BuyPD represented.[45]  Plaintiffs also maintain Defendants misrepresented the value of the North Port lot, which Johnson recommended as an investment property.[46]

Johnson provided Grigsby and Taylor with a Property Analysis Report for each Rental Property that included a title summary bearing Guardian Law's name but purportedly prepared by Johnson.[47]  Improvement Homes, LLC was listed as the owner of the Calumet City property;[48] Interactive Homes as the owner of the Sauk Village property;[49] and Expansion Properties as the owner of the Ferndale property.[50]  Plaintiffs allege IvyVest Properties owned the North Port lot.[51]

Grigsby and Taylor allege they were required to use Guardian Law for title services and were not informed about how Guardian Law was connected to the other Defendants, who

---

[42] *Id.*

[43] *Id.* ¶¶ 112, 159, 199.

[44] *Id.* ¶¶ 114, 161, 201.

[45] *Id.*

[46] *Id.* ¶¶ 237–39.

[47] *Id.* ¶¶ 115, 122, 162, 169, 202, 209.

[48] *Id.* ¶ 122.

[49] *Id.* ¶ 169.

[50] *Id.* ¶ 209.

[51] *Id.* ¶ 236.

received funds from the settlement charges at closing.[52]  LMW was required to use Insider's

Cash as the lender for at least one property and to sign a limited power of attorney appointment

that allowed another person to sign closing documents on LMW's behalf for all the properties.[53]

### Problems with the Properties

The parties closed on the Calumet City property in April 2015.[54]  The Buying Summit

Defendants represented to Plaintiffs that title to the property would be recorded four to six weeks

after closing, at which time Plaintiffs would begin to receive rent payments.[55]  After that time

period passed without the title being recorded, Taylor emailed the Buying Summit Defendants,

Guardian Law, and Lift Property Management about the status of recording.[56]  On November 18,

2015, a Guardian Law employee replied, stating that Guardian Law had already sent the recorder

the funds and that the title would be recorded that week.[57]  On December 2, the Guardian Law

employee emailed Taylor and stated that the property did not pass inspection but that BuyPD was

"correcting those items" and "might have more information on the inspection."[58]  The next day, a

BuyPD employee told Taylor that BuyPD was "not seeing anything regarding a failed

inspection."[59]  On February 17, 2016, the Buying Summit Defendants emailed Grigsby and

Taylor and stated the deed to the Calumet City property had been recorded and that a copy of the

deed was attached to the email.[60]  Plaintiffs allege these representations were false, as the deed to

---

[52] *Id.* ¶¶ 129, 177, 217, 245.

[53] *Id.* ¶¶ 133–34, 176, 216, 244.

[54] *Id.* ¶ 130.

[55] *Id.* ¶ 138.

[56] *Id.* ¶ 139.

[57] *Id.* ¶ 140.

[58] *Id.*

[59] *Id.*

[60] *Id.*

the property had still not been recorded, and the deed that the Buying Summit Defendants had emailed was actually a copy of the deed transferring title from John Graham Inc. to Improvement Homes.[61] On October 12, 2016, an attorney for Plaintiffs emailed BuyPD to give notice that Plaintiffs sought to rescind the contract since BuyPD had not secured a deed.[62] Nine days later, the deed transferring title from Improvement Homes to LMW was recorded.[63]

In late 2015, Grigsby and Taylor contacted BuyPD about receiving their guaranteed rent reimbursements since the properties did not have any tenants.[64] The Amended Complaint alleges BuyPD deceived Plaintiffs into signing a release of claims by telling Grigsby and Taylor they were required to sign a "Settlement Agreement and Release" to receive the promised rental reimbursements for each Rental Property.[65]

Plaintiffs filed this suit in October 2017 and amended their Complaint in January 2018.[66] The Amended Complaint includes claims for (1) violation of the Racketeering Influenced and Corrupt Organizations Act by all Defendants; (2) civil conspiracy by all Defendants; (3) breach of fiduciary duty against BuyPD, Income Property, and Guardian Law; (4) fraudulent inducement by BuyPD, Income Property, Yancey, Real Estate Education Group, EvTech Media, Improvement Homes, Insider's Cash, Guardian Law, Interactive Homes, Expansion Properties, and Ivyvest Properties; and (5) in the alternative, breach of contract and duty of good faith and fair dealing by Improvement Homes.

---

[61] *Id.* ¶ 141.

[62] *Id.* ¶ 143.

[63] *Id.* ¶ 144.

[64] *Id.* ¶¶ 147, 188, 228.

[65] *Id.* ¶¶ 148, 190, 230.

[66] Dkt. 27.

**ANALYSIS**

## I.       Seminar Defendants' Motion to Compel Arbitration

The Seminar Defendants ask the court to compel arbitration of Plaintiffs' claims against them based on arbitration clauses in the terms and conditions of the purchase orders signed by Grigsby and Taylor.  Plaintiffs argue the dispute is outside the scope of the arbitration clauses, the clauses are unconscionable and therefore void, and they cannot be enforced by Real Estate Education Group or EvTech Media, which were not parties to the purchase orders.

Before deciding whether a dispute is arbitrable, the court must first look to who should decide arbitrability—the court or an arbitrator.[67]  When addressing the question of whether an arbitrator should decide arbitrability, the presumption is that the parties did not agree to arbitrate arbitrability unless there is "clear and unmistakable evidence" that they did so.[68]  If the court determines the parties agreed to arbitrate arbitrability, it should go no further and compel arbitration.

In this case, the parties agreed that "any and all disputes which may arise between them shall be decided in binding arbitration conducted by the American Arbitration Association," but they did not refer to or incorporate any rules that give the arbitrator the authority to decide the question of arbitrability.[69]  Neither party argues they had the intent to arbitrate arbitrability.  The court concludes the reference to the American Arbitration Association is insufficient to establish clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.  Thus, the court must decide the issue of arbitrability.

---

[67] *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1281 (10th Cir. 2017).

[68] *Id.*

[69] Dkt. 30, Exs. 1–3.

## A. Arbitrability

In analyzing whether the parties agreed to arbitrate a dispute, the court begins with "a strong presumption that the dispute is arbitrable"[70] and then applies "ordinary state-law principles that govern the formation of contracts."[71]  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability," such as fraud in the inducement.[72]

The arbitration clauses at issue here state the parties to the purchase order agree to arbitrate "any and all disputes which may arise between them."[73]  Plaintiffs argue the arbitration clauses do not cover their claims because they "do not contest the receipt or quality of the education or materials in this lawsuit."[74]  Rather, Plaintiffs state, their allegations are based on the Defendants' conduct in "identifying persons with sufficient assets and trusting tendencies and convincing them that the techniques they were teaching were too hard and they should instead submit themselves as victims of the Buying Summit to avoid the education they were receiving."[75]  Plaintiffs argue this conduct is so unrelated to the real estate education acquired through the purchase orders that the arbitration clauses do not cover it.

The Tenth Circuit addressed similar language in *In re Cox Enterprises*, in which plaintiffs subscribed to a premium cable service from Cox Communications.[76]  The plaintiffs rented a set-

---

[70] *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1201 (10th Cir. 2016).

[71] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

[72] *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

[73] Dkt. 30, Exs. 1–3.

[74] Dkt. 49, at 5.

[75] *Id.* at 6.

[76] 835 F.3d at 1199.

top box before Cox changed its subscription agreement to require arbitration of claims.[77]  The

arbitration agreement stated that arbitration would apply to "any and all claims or disputes

between us . . . that arise out of or in any way relate to . . . this Agreement [and] any services or

goods that Cox or any of its affiliated entities provide to you under any other agreement."[78]  The

Tenth Circuit held the plaintiffs' antitrust claim, which alleged illegal tying of the cable service

to rental of the set-top box, was within the scope of the arbitration agreement "even though it

arises out of events that predated the agreement."[79]

The court concludes the Tenth Circuit's logic applies here and the arbitration clauses

cover Plaintiffs' claims.  Even if the court accepts Plaintiffs' argument that the conduct

underlying their claims is the identification and manipulation of victims under the allegedly

fraudulent scheme, the purchase orders are allegedly part of that scheme and therefore

reasonably connected to the Plaintiffs' claims.

## B.  Unconscionability

Plaintiffs argue that even if their claims are within the scope of the arbitration clauses, as

the court has now concluded, the clauses are nevertheless void because they are unconscionable.

Where parties argue arbitration clauses are void, the court must first determine whether

this argument attacks the contract as a whole or only the arbitration clauses.[80]  If the argument is

functionally a challenge to contract as a whole, and not specifically to the arbitration clause, the

---

[77] *Id.*

[78] *Id.*

[79] *Id.* at 1202.

[80] *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967).

court must compel arbitration.[81]  Plaintiffs here allege both substantive and procedural unconscionability.[82]  For the reasons discussed below, the court concludes only the substantive unconscionability arguments are directed toward the arbitration clauses and thus the court will address only those arguments.

### 1.   *Substantive unconscionability*

When analyzing substantive unconscionability, the court looks to whether the terms of the agreement are "so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an overall imbalance in the obligations and rights imposed by the bargain . . . according to the mores and business practices of the time and place."[83]  A determination that an agreement is unconscionable "cannot be based on the notion that arbitration is inferior to litigation in court."[84]  However, courts will apply the "effective vindication" principle to invalidate, on public policy grounds, arbitration agreements that operate as a "prospective waiver of a party's right to pursue statutory remedies."[85]

Plaintiffs argue the arbitration provisions in the purchase orders are substantively unconscionable because they prevent Plaintiffs from effectively vindicating their statutory

---

[81] *Buckeye Check Cashing v. Cardegna*, 546 U.S. 440, 443, 449 (2006) (holding claim that contract was void because it violated state lending and consumer protection laws was a challenge "to the validity of the contract as a whole, and not specifically to the arbitration clause," and therefore must go to the arbitrator).

[82] Under Utah law, the court uses a two-prong analysis when determining whether a contract is unconscionable. "The first prong—substantive unconscionability—focuses on the agreement's contents. The second prong— procedural unconscionability—focuses on the formation of the agreement." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998).  In some cases, "substantive unconscionability alone may support a finding of unconscionability," but "procedural unconscionability without any substantive imbalance will rarely render a contract unconscionable." *Id.*

[83] *Id.* (alteration in original) (citation omitted).

[84] *THI of New Mexico at Hobbs Ctr., LLC v. Patton*, 741 F.3d 1162, 1165 (10th Cir. 2014).

[85] *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) (emphasis omitted).

remedies under the Racketeer Influenced and Corrupt Organizations Act (RICO). First, Plaintiffs argue the arbitration clauses' requirement that each party bear their own attorney's fees and costs prevents them from pursuing their statutory remedy of attorney's fees under RICO. Second, Plaintiffs argue the arbitration clauses prohibit consolidating disputes, which Plaintiffs state would force them to initiate fifty-four separate arbitration proceedings against the Seminar Defendants, while at the same time pursuing their claims against the remaining Defendants in litigation. Plaintiffs argue this process would lead to "outlandish and oppressive" costs and would prevent Plaintiffs from presenting an effective claim under RICO, which depends on presentation of multiple bad acts.

The Supreme Court has held that the effective vindication principle "would certainly cover a provision in an arbitration agreement forbidding the assertion of certain statutory rights."[86] The Tenth Circuit applied this principle in *Nesbitt v. FCNH*, in which a plaintiff alleged the defendants violated the Fair Labor Standards Act (FLSA) and other wage and hours laws.[87] The plaintiff there argued a provision in the arbitration agreement that required each party to bear its own attorney's fees and costs prevented her from effectively vindicating her remedy under the FLSA, which provides that plaintiffs could recover a reasonable attorney's fee and costs.[88] The Tenth Circuit agreed and affirmed the district court's decision not to compel arbitration.[89]

Plaintiffs argue the arbitration clauses in this case would similarly bar them from pursuing their statutory remedy of attorney's fees and costs. The RICO statute provides that a

---

[86] *Id.*

[87] 811 F.3d 371, 375 (10th Cir. 2016).

[88] *Id.*

[89] *Id.* at 378.

successful plaintiff "shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."[90] Plaintiffs argue they cannot pursue this remedy if the court enforces the arbitration clauses at issue, which state "each party will bear its own costs and attorneys' fees."[91]

The Seminar Defendants argue that the Supreme Court has definitively held that RICO claims are arbitrable, citing *PacifiCare Health Systems v. Book*.[92] In that case, the arbitration provisions prohibited an award of punitive damages, which the plaintiffs argued would bar them from pursuing the RICO statute's remedy of treble damages.[93] The Supreme Court noted that, given the inconsistency in case law concerning whether treble damages were treated as compensatory or punitive, it was unclear whether the arbitration provisions would bar the plaintiffs' statutory remedy.[94] The Court refused to engage in "mere speculation" in determining how an arbitrator would resolve this inconsistency, and it compelled arbitration.[95]

The Seminar Defendants argue the holding in *PacifiCare* requires the court to compel arbitration for Plaintiffs' RICO claim. But *PacifiCare* dealt with an ambiguity that is not present in this case. Here, the language in the arbitration clauses—"each party will bear its own costs and attorneys' fees"—undoubtedly covers attorney's fees as referenced in the RICO statute. This language, if enforced, would prevent Plaintiffs from effectively vindicating their right to pursue the statutory remedy of attorney's fees in arbitration.

---

[90] 18 U.S.C. § 1964(c).

[91] Dkt. 30, Exs. 1–3.

[92] 538 U.S. 401 (2003).

[93] *Id.* at 403.

[94] *Id.* at 405–06.

[95] *Id.* at 406–07.

The possibility that an arbitrator could later grant an award of fees to Plaintiffs does not contradict this conclusion. As the Tenth Circuit noted in *Nesbitt*, there may be some ambiguity in whether a fee award is still available, despite language in the arbitration provision that expressly stated each party shall bear its own fees.[96] But that ambiguity was not a lack of clarity about the meaning of a word within an arbitration provision, like in *PacifiCare*. Rather, the ambiguity stemmed from what the arbitrator would choose to do when faced with the option of awarding fees. The Tenth Circuit rejected the idea that this ambiguity would force the parties to arbitrate, noting that the "mere possibility" that a plaintiff could later recover fees if the arbitrator chose to grant them was not the same as the plaintiff's statutory remedy.[97]

Similarly, in this case, any ambiguity presented stems not from the meaning of a word in the arbitration clauses but rather from whether an arbitrator would choose to award fees to Plaintiffs if they prevail. Because this ambiguity means Plaintiffs' statutory remedy is not protected, the court concludes the provisions concerning attorney's fees in the arbitration clauses in this case prevent Plaintiffs from effectively vindicating their RICO claim. Thus, the court will not compel arbitration on Plaintiffs' RICO claim.[98]

Plaintiffs urge the court to invalidate the entire arbitration clause on this basis, while the Seminar Defendants ask the court to sever the attorney's fee provision but compel arbitration on the remaining claims.

The parties dispute who bears the burden on the question of severability. The Seminar Defendants urge the court to hold that the party seeking to avoid arbitration bears the burden

---

[96] 811 F.3d at 380.

[97] *Id.* at 380–81.

[98] Because the court concludes the RICO claim should not be submitted to arbitration based on the attorney's fees provision, it does not need to decide whether the arbitration clause's prohibition on joining disputes also would prevent Plaintiffs from effectively vindicating their RICO claim.

because of the "strong presumption in favor of arbitration." Plaintiffs argue the doctrine of severance is similar to an affirmative defense, which would place the burden on the Seminar Defendants. In the absence of controlling law on this point, the court looks to the parties' overall burden on a Motion to Dismiss. The Seminar Defendants, as the moving party, have the burden to show that even if the court accepts as true all well-pleaded allegations and draws all reasonable inferences in Plaintiffs' favor, Plaintiffs have failed to state a claim for relief.[99] To do so, the Seminar Defendants must show that they have a valid arbitration clause that controls Plaintiffs' claims. Thus, the court concludes it is ultimately the Seminar Defendants' burden to show that the arbitration clause is valid even if the attorney's fee provision is not. For the reasons discussed below, the court concludes the Seminar Defendants have not met this burden.

State law applies to the determination of whether severability is proper.[100] In Utah, whether a contract is severable depends on "the intent of the parties at the time they entered into the contract."[101] To determine the parties' intent, the court first looks to the four corners of the contract, then to "other contemporaneous writings concerning the same subject matter," and finally to extrinsic parol evidence.[102]

There is no mention of severability within the four corners of the purchase orders in this case. Nor have the parties presented any contemporaneous writings or extrinsic parol evidence expressing any intent concerning severability. Thus, it appears the parties did not intend severability for the purchase orders. Where the parties did not intend severability at the formation of the agreement, the court declines to write that term into the contract after the fact.

---

[99] *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013) (citation omitted).

[100] *See, e.g., Pollard v. ETS PC, Inc.*, 186 F. Supp. 3d 1166, 1178 (D. Colo. 2016); *Mantooth v. Bavaria Inn Rest., Inc.*, No. 17-CV-1150-WJM-MEH, 2018 WL 2241130, at *9 (D. Colo. May 16, 2018).

[101] *Mgmt. Servs. Corp. v. Dev. Assocs.*, 617 P.2d 406, 408 (Utah 1980).

[102] *Id.*

Thus, the court concludes severability is inapplicable here, and the effective vindication doctrine renders the entire arbitration provision unenforceable.[103]  As a result, the Seminar Defendants' Motion to Dismiss and Compel Arbitration is denied.[104]

## II.     Property Defendants' Motion to Dismiss and Enforce Settlement Agreements

The Property Defendants filed a Motion to Dismiss, asking the court to dismiss all claims against them on the basis of three Releases.[105]  The Property Defendants argue these Releases establish an affirmative defense that mandates dismissal of all claims against them.[106]

The court must first determine whether the Releases are appropriate to consider at the motion-to-dismiss stage.  The court may consider materials outside the pleadings if they are referenced in the complaint, central to the Plaintiffs' claims, and indisputably authentic.[107]

The Amended Complaint makes multiple references to the Releases.[108] And the allegations concerning the Releases are central to Plaintiffs' various claims against the Property Defendants, particularly those for fraud.  Additionally, Plaintiffs do not dispute the authenticity of the copies of the Releases appended to the Property Defendants' Motion.  As such, it is appropriate for the court to consider the Releases in deciding this Motion.

---

[103] *See Nesbitt v. FCNH, Inc.*, 74 F. Supp. 3d 1366, 1373 (D. Colo. 2014), *aff'd*, 811 F.3d 371 (10th Cir. 2016).

[104] Because the arbitration clauses are unenforceable, the court need not address whether EvTech and Real Estate Education Group, as non-parties, may enforce the agreements.

[105] Defendants refer to these contracts as settlement agreements and urge the court to "summarily enforce" them.  A settlement agreement is generally a contract the parties enter into while litigation is pending.  *See United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993).  In contrast, the contracts at issue here were entered into before litigation began.  Thus, summary enforcement is not appropriate, and the court will apply general principles of federal civil procedure and Utah contract law.

[106] *See* Fed. R. Civ. P. 8(c)(1) (identifying release as an affirmative defense).

[107] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[108] Dkt. 27, ¶¶ 146–52, 188–94, 229–34.

However, consideration of the Releases does not itself establish the Property Defendants' affirmative defense of release. At the motion-to-dismiss stage, dismissal based on an affirmative defenses is appropriate only "when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for [the defense's] elements."[109] The court also "accept[s] as true all well-pleaded facts [in the complaint], and construe[s] all reasonable allegations in the light most favorable to the plaintiff."[110]

In the Amended Complaint, Plaintiffs allege the Releases were the product of fraudulent inducement and a conspiracy among the Defendants.[111] Factual issues therefore exist as to whether the contracts are valid and enforceable.[112] Thus, it is not clear from the face of the Amended Complaint that the affirmative defense would succeed.[113] Accordingly, the Property Defendants' Motion to Dismiss is denied.[114]

---

[109] *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).

[110] *Sunrise Valley, LLC v. Kempthorne*, 528 F.3d 1251, 1254 (10th Cir. 2008) (citation omitted).

[111] Dkt. 27, ¶¶ 150, 192, 232.

[112] *See Preventive Energy Sols., LLC v. nCap Ventures 5 LLC*, No. 2:16-CV-809-PMW, 2017 WL 87028, at *4 (D. Utah Jan. 10, 2017) ("It is axiomatic that a party cannot use a boilerplate disclaimer as a shield from liability for fraudulent conduct. Accordingly, the [defendant's] disclaimer does not defeat [plaintiff's] fraud and negligent misrepresentation claims" at the motion-to-dismiss stage.); *Crabtree v. Woodman*, No. 2:06-CV-946-TC, 2008 WL 4276957, at *5 (D. Utah Sept. 11, 2008) (release is voidable if defendant made a false promise to induce plaintiff into signing it).

[113] *See Fernandez*, 883 F.3d at 1299.

[114] The Property Defendants also argue that "as-is" provisions in the real estate contracts preclude Plaintiffs' claims. Even assuming those contracts were proper to consider at this stage, the Property Defendants' arguments about the "as-is" provisions fail for the same reasons as their arguments about the Releases—namely, that Plaintiffs allege they were fraudulently induced into signing them.

Guardian Law filed a Motion to Dismiss and Enforce Settlement Agreements based on the same contracts between Property Defendants and Plaintiffs.[115]  For the reasons stated above, this Motion is also denied.[116]

### III.    Guardian Law's Motion to Dismiss for Failure to State a Claim

To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[117]  A complaint "does not need detailed factual allegations," but it must put forward "more than labels and conclusions."[118]  In reviewing the motion, the court accepts "the well-pleaded allegations of the complaint as true" and construes them "in the light most favorable to the plaintiff."[119]

Guardian Law argues the court should dismiss all of Plaintiffs' claims against it because the Amended Complaint fails to allege plausible claims for relief.

### A.  Statute of limitations

Guardian Law first argues any claims arising out of professional services rendered in Illinois and Florida should be dismissed based on those states' statutes of limitations.  Even assuming the court would apply Illinois or Florida law to those claims, Guardian Law's argument cannot be resolved at the motion-to-dismiss stage.

Statute of limitations questions may be resolved by a motion to dismiss, but only where "the dates given in the complaint make clear that the right sued upon has been extinguished."[120]

---

[115] Dkt. 45.

[116] Because the court denies Guardian Law's Motion on the basis that it has not shown an affirmative defense that is clear on the face of the Amended Complaint, it need not reach Plaintiffs' argument that Guardian Law was prohibited from filing a second Rule 12(b)(6) Motion.  Dkt. 55 at 2.

[117] Fed. R. Civ. P. 8(a).

[118] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

[119] *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013) (citation omitted).

[120] *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980).

Accordingly, where a factual issue exists concerning whether the statute of limitations is tolled, a motion to dismiss on this basis must be denied. Construing the facts in the Amended Complaint as true, Plaintiffs did not have reason to know of their claims until after the closing of the properties, which creates a factual issue concerning whether the statute of limitations is tolled.[121] Thus, it is unnecessary for the court to address Guardian Law's statute of limitations arguments at this stage.

## B. RICO

Guardian Law also argues the court should dismiss Plaintiffs' RICO claim because Plaintiffs fail to allege the necessary elements.

A plaintiff alleging a RICO violation must show the defendant (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity.[122] A RICO claim must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires a plaintiff alleging fraud to state with particularity the circumstances constituting fraud or mistake.[123] Thus, the plaintiff must "set forth the who, what, when, where and how of the alleged fraud" and describe "the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."[124]

Guardian Law argues the Amended Complaint fails to allege facts that it engaged in racketeering activity or conducted an enterprise's affairs. Guardian Law also argues the Amended Complaint does not satisfy Rule 9(b)'s specificity requirement.

---

[121] Both Illinois and Florida law allow for tolling of statutes of limitations. *See Williams v. Bd. of Review*, 948 N.E.2d 561, 567 (Ill. 2011); *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 (Fla. 2001).

[122] 18 U.S.C. § 1962.

[123] *See Cayman Expl. Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357, 1362 (10th Cir. 1989).

[124] *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726–27 (10th Cir. 2006).

*1. Racketeering activity*

Guardian Law argues the Amended Complaint fails to allege any racketeering activity because Guardian Law only established a business and conducted real estate closings, all of which was lawful activity.

"Racketeering activity" includes acts of mail and wire fraud,[125] which requires a showing of "(1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails [or] . . . interstate wire, radio or television communications in furtherance of the scheme to defraud."[126]

The Amended Complaint alleges an employee of Guardian Law stated in an email to Taylor on November 18, 2015, that Guardian Law had "checked with our recorders in the state" and that it had "sent the recorder the funds already and they are saying that they will have these recorded this week."[127] Plaintiffs allege that on December 2, 2015, the same employee emailed Taylor and stated that Guardian Law had "checked in with the recorders who are handling getting this recorded and it looks like it did not pass inspection. Buypd [sic] is correcting those items. BuyPD might have more information on the inspection if you are wanting to know more about that."[128] Plaintiffs allege the deed was not recorded until October 2016, but they do not adequately allege the Guardian Law employee's statements were false when made. Additionally, Plaintiffs do not allege they relied on these statements rather than BuyPD's later statements that there was no failed inspection or that the deed had been recorded by February 2016. Thus, these

---

[125] 18 U.S.C. § 1961(1).

[126] *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 892 (10th Cir. 1991).

[127] Dkt. 27 at ¶ 140.

[128] *Id.*

allegations are insufficient to plead mail or wire fraud.[129]  Plaintiffs identify no other factual

allegations in support of their RICO claim against Guardian Law.  Accordingly, the RICO claim

against Guardian Law is dismissed.

### C.  Civil conspiracy

Guardian Law also argues the Amended Complaint does not adequately allege its

participation in a civil conspiracy.

In Utah, civil conspiracy requires proof of five elements: "(1) a combination of two or

more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or

course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result

thereof."[130]  "Where the unlawful act underlying the civil conspiracy is a fraud-based tort, both

the underlying tort and the conspiracy claim must be pleaded with particularity."[131]

Guardian Law argues it did not commit any unlawful acts and was not combined with

any of the other Defendants.  The Amended Complaint alleges Guardian Law committed

unlawful acts because it was responsible for several Property Analysis Reports containing a title

summary "bearing Guardian Law's name, but also purportedly prepared by Johnson."[132]  These

allegations do not support a reasonable inference that Guardian Law is liable for the alleged

misrepresentations in the title summary.  Plaintiffs do not allege Johnson is an employee or agent

of Guardian Law or that Guardian Law granted him any authority to use its name or logo on the

---

[129] Because Plaintiffs have failed to adequately plead that Guardian Law engaged in racketeering activity, the court need not address whether Guardian Law participated in the operation or management of the enterprise's affairs or whether the Amended Complaint satisfied Rule 9(b)'s pleading requirements.

[130] *Pohl, Inc. of Am. v. Webelhuth*, 2008 UT 89, ¶ 29, 201 P.3d 944 (citation omitted).

[131] *Zero Down Supply Chain Sols., Inc. v. Glob. Transp. Sols., Inc.*, No. 2:07-CV-400 TC, 2008 WL 4642975, at *9 (D. Utah Oct. 17, 2008).

[132] Dkt. 27 at ¶¶ 115, 122, 162, 169, 202, 209.

title summary.  Thus, the Amended Complaint does not adequately allege Guardian Law committed any unlawful acts, and the civil conspiracy claim against Guardian Law is dismissed.

### D.  Breach of fiduciary duty

Guardian Law argues the breach of fiduciary duty claim fails because it does not owe Plaintiffs such a duty.

"Breach of fiduciary duty claims generally require proof of four elements: the existence of a fiduciary relationship . . . ; breach of the fiduciary duty; causation, both actual and proximate; and damages."[133]

The Amended Complaint alleges Guardian Law provided title services and legal services to Plaintiffs, which established a fiduciary duty.  In response, Guardian submitted "Conflict of Interest Disclosure" documents signed by Grigsby and Wade stating Guardian Law does not represent them, that they waive any possible conflict of interest with respect to the purchase, and that Grigsby and Taylor "should consult with an attorney."[134]

The court will not consider the Conflict of Interest Disclosures at the motion-to-dismiss stage because they are not referred to in the Amended Complaint or central to Plaintiffs' claim.[135]  Although the court could convert the Motion to Dismiss to a Motion for Summary Judgment on this claim and consider material outside the pleadings,[136] judicial efficiency would not be served by conversion in this case.  Before converting a motion to dismiss  into one for summary judgment, the court must give notice to the parties and allow Plaintiffs to submit material outside the pleadings as well.  Because several of the claims in this case are intertwined,

---

[133] *Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*, 2018 UT 4, ¶ 52, 417 P.3d 95.

[134] Dkt. 32, Exs. 8, 10, 11, 12.

[135] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[136] *Wheeler v. Hurdman*, 825 F.2d 257, 259 (10th Cir. 1987).

discovery would be a more efficient means of proceeding. Thus, the court declines to convert Guardian Law's Motion into one for summary judgment or consider the Conflict of Interest Disclosures. When considering only the allegations in the Amended Complaint, Plaintiffs have adequately alleged the elements of a breach of fiduciary duty claim. Thus, the Motion to Dismiss this claim is denied.

### E. Fraudulent inducement

Plaintiffs allege Guardian Law, as a co-conspirator, fraudulently induced them to purchase the Calumet City, Sauk Village, Ferndale, and North Port properties. Because the court has dismissed the conspiracy claim against Guardian Law, those allegations cannot form the basis for a fraudulent inducement claim. The Amended Complaint does not contain any other allegations that Guardian Law fraudulently induced Plaintiffs into purchasing the properties. Thus, this claim is dismissed as to Guardian Law.

**SO ORDERED** this 26th day of September, 2018.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge